### IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

WIND TOWER TRADE COALITION

                Plaintiff,

      v.

UNITED STATES,

                Defendant,

      and

DONGKUK S&C CO., LTD.,

                Defendant-Intervenor.

Before: Hon. Leo M. Gordon,
Senior Judge

Court No. 25-00104

### WIND TOWER TRADE COALITION RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, Plaintiff Wind Tower Trade Coalition ("WTTC"), by and through its attorneys, respectfully moves for judgment on the agency record with respect to the final administrative determination issued by the U.S. Department of Commerce ("Commerce"), in the 2022-2023 administrative review of the antidumping duty order on *Utility Scale Wind Towers From the Republic of Korea*, 90 Fed. Reg. 19,672 (Dep't of Commerce May 9, 2025) and accompanying Issues and Decision Memorandum.

WTTC respectfully moves, for the reasons explained in the accompanying memorandum, that this Court find that agency findings, conclusions, and decisions with respect to this determination are unexplained, not supported by substantial evidence, or otherwise not in accordance with law. WTTC further moves that the Court remand this determination to Commerce for disposition consistent with the Court's final opinion.

**Court No. 25-00104**

Respectfully submitted,

*/s/ Robert E. DeFrancesco, III*
Robert E. DeFrancesco, III, Esq.
Maureen E. Thorson, Esq.
Laura El-Sabaawi, Esq.
John Allen Riggins, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Wind Tower Trade Coalition*

Dated: November 10, 2025

**Court No. 25-00104**

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

**WIND TOWER TRADE COALITION**

                                        **Plaintiff,**

    **v.**

**UNITED STATES,**

                                        **Defendant,**

    **and**

**DONGKUK S&C CO., LTD.,**

                                        **Defendant-Intervenor.**

**Before: Hon. Leo M. Gordon,**
    **Senior Judge**

**Court No. 25-00104**

### <u>ORDER</u>

Upon consideration of Plaintiff Wind Tower Trade Coalition's ("WTTC") Rule 56.2 Motion for Judgment on the Agency Record and the accompanying memorandum, and upon all other papers filed and proceedings had herein, it is hereby

**ORDERED** that WTTC's motion for judgment on the agency record is granted; and it is further

**ORDERED** that this action is remanded to the U.S Department of Commerce for proceedings consistent with this Court's opinion.

Dated: _____                 _____
      New York, New York                                       Hon. Leo M. Gordon, Judge

NON-CONFIDENTIAL VERSION

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **WIND TOWER TRADE COALITION**<br><br>                       **Plaintiff,**<br><br>     v.<br><br>**UNITED STATES,**<br><br>                   **Defendant,**<br><br>     **and**<br><br>**DONGKUK S&C CO., LTD.,**<br><br>                  **Defendant-Intervenor.** | **Before: Hon. Leo M. Gordon,**<br>         **Senior Judge**<br><br>**Court No. 25-00104**<br><br><u>**NON-CONFIDENTIAL VERSION**</u><br><br>**Business Proprietary Information**<br>**Removed from Pages: 2, 5, 7-11, 15-18** |

<u>**WIND TOWER TRADE COALITION MEMORANDUM OF LAW**</u>
<u>**IN SUPPORT OF RULE 56.2 MOTION**</u>
<u>**FOR JUDGMENT ON THE AGENCY RECORD**</u>

**Robert E. DeFrancesco, III, Esq.**
**Maureen E. Thorson, Esq.**
**Laura El-Sabaawi, Esq.**
**John Allen Riggins, Esq.**

**WILEY REIN LLP**
**2050 M Street, NW**
**Washington, DC 20036**
**(202) 719-7000**

*Counsel to Wind Tower Trade Coalition*

**Dated:  November 10, 2025**

**Court No. 25-00104**                                    NON-CONFIDENTIAL VERSION

## <u>TABLE OF CONTENTS</u>

Page

I.  STATEMENT PURSUANT TO RULE 56.2(C) ................................................................. 1

    A.  Administrative Determination Under Review ............................................................. 1

    B.  Issues Presented ........................................................................................................ 1

    C.  Request for Court Order and Relief Sought ............................................................... 2

II.  ARGUMENT ..................................................................................................................... 2

    A.  Commerce's Decision to Accept Unadjusted Conversion Costs that Differed in Ways Unrelated to the Physical Characteristics of the Merchandise Was Unlawful .................................................................................... 2

        1.  Standard of Review ........................................................................................... 2

        2.  Commerce Arbitrarily Departed from Its Established Practice of Adjusting Conversion Costs That Are Unrelated to the Physical Characteristics of the Subject Merchandise ......................................................... 3

        3.  Commerce's Conversion Cost Analysis is Factually and Logically Flawed .......................................................................................................... 8

    B.  Commerce's Decision to Rely on Dongkuk's CV Profit Ratio from the Previous Review was Not in Accordance with Law or Supported by Substantial Evidence ............................................................................................... 11

        1.  Standard of Review ......................................................................................... 11

        2.  Commerce Departed from Its Standard Practice of Rejecting Information from Unprofitable Companies when Selecting Between Potential Sources Under 19 U.S.C. § 1677b(e)(2)(B)(iii) .......................................................................................................... 12

III.  CONCLUSION ................................................................................................................ 18

Court No. 25-00104                                    NON-CONFIDENTIAL VERSION

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Dongkuk S&C Co. v. United States*,
    134 F.4th 1320 (Fed. Cir. 2025) ...............................................................6

*Dongkuk S&C Co. v. United States*,
    548 F. Supp. 3d 1376 (Ct. Int'l Trade 2021) ..........................................6

*Husteel Co. v. United States*,
    471 F. Supp. 3d 1349 (Ct. Int'l Trade 2020) .........................................13

*Husteel Co. v. United States*,
    98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) ...........................................13

*Mid Continent Steel & Wire, Inc. v. United States*,
    941 F.3d 530 (Fed. Cir. 2019)................................................................13

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)............................................................................3, 12

*NMB Sing. Ltd. v. United States*,
    557 F.3d 1316 (Fed. Cir. 2009)..........................................................2, 11

*SKF USA Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001)....................................................2, 11, 13

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
    44 F. 3d 978 (Fed. Cir. 1994)............................................................3, 12

*Thai I-Mei Frozen Foods Co. v. United States*,
    572 F. Supp. 2d 1353 (Ct. Int'l Trade 2008) .........................................13

*Thai Plastic Bags Indus. Co. v. United States*,
    746 F.3d 1358 (Fed. Cir. 2014)...........................................................3, 4

**Statutes**

19 U.S.C. § 1516a(b)(1)..................................................................................2, 11

19 U.S.C. § 1677b(a)(4).......................................................................................12

19 U.S.C. § 1677b(e)(2)(B)(i).............................................................................13

Court No. 25-00104                                    NON-CONFIDENTIAL VERSION

19 U.S.C. § 1677b(e)(2)(B)(iii) ............................................................................2, 12

19 U.S.C. § 1677b(f)(1)(A) .....................................................................................3, 8

**Administrative Materials**

*Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,339
(Dep't of Commerce Feb. 27, 1996) .............................................................4

Decision Memorandum for the Preliminary Determination in the Less-Than-Fair-
Value Investigation of Utility Scale Wind Towers from Malaysia
(Dep't of Commerce May 18, 2021) ............................................................15

Decision Memorandum for the Preliminary Results of the Administrative Review
of the Antidumping Duty Order on Utility Scale Wind Towers from Korea;
2022-2023 (Dep't of Commerce Sept. 6, 2025) ..........................................13

Notice of Final Determination of Sales at Less Than Fair Value: Polyvinyl
Alcohol from the Republic of Korea (Dep't of Commerce Aug. 11, 2003) ..........................14

Issues and Decision Memorandum for the Final Affirmative Determination and
Final Negative Critical Circumstances Determination in the Less-Than-Fair-
Value Investigation of Carbon and Alloy Steel Wire Rod from the Republic of
Korea (Dep't of Commerce Mar. 19, 2018) ..............................................3, 6

Issues and Decision Memorandum for the Final Affirmative Determination in the
Antidumping Duty Investigation of Biodiesel from Indonesia
(Dep't of Commerce Feb. 20, 2018) ............................................................14

Issues and Decision Memorandum for the Final Affirmative Determination in the
Less-Than-Fair-Value Investigation of Common Alloy Aluminum Sheet from
Italy (Dep't of Commerce Mar. 1, 2021) .....................................................4

Issues and Decision Memorandum for the Final Affirmative Determination in the
Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from
Indonesia (Dep't of Commerce June 29, 2020) ........................................4, 5

Issues and Decision Memorandum for the Final Affirmative Determination of
Sales at Less-Than-Fair-Value of Frozen Warmwater Shrimp from Indonesia
(Dep't of Commerce Oct. 21, 2024) ............................................................14

Issues and Decision Memorandum for the Final Results of 4th Administrative
Review and 2nd New Shipper Review: Certain Frozen Fish Fillets from the
Socialist Republic of Vietnam ("Vietnam")
(Dep't of Commerce Mar. 9, 2009) .............................................................15

**Court No. 25-00104**                                          NON-CONFIDENTIAL VERSION

Issues and Decision Memorandum for the Final Results of the 2018-2019
     Administrative Review of the Antidumping Duty Order on Certain Steel Nails
     from the Sultanate of Oman (Dep't of Commerce Feb. 24, 2021) ...........................................14

Issues and Decision Memorandum for the Final Results of the 2022-2023
     Administrative Review of the Antidumping Duty Order on Utility Scale Wind
     Towers from the Republic of Korea (Dep't of Commerce May 2, 2025) .................................1

Issues and Decision Memorandum for the Less-Than-Fair-Value Investigation of
     Electrolytic Manganese Dioxide from Australia
     (Dep't of Commerce Aug. 14, 2008) ....................................................................................14

*Utility Scale Wind Towers From the Republic of Korea*, 90 Fed. Reg. 19,672
     (Dep't of Commerce May 9, 2025) ..........................................................................................1

NON-CONFIDENTIAL VERSION

## MEMORANDUM IN SUPPORT OF MOTION
## FOR JUDGMENT UPON THE AGENCY RECORD

Plaintiff Wind Tower Trade Coalition ("Plaintiff" or "WTTC") respectfully submits this memorandum in support of WTTC's Rule 56.2 motion for judgment on the agency record in this action.

## I.     STATEMENT PURSUANT TO RULE 56.2(C)

### A.     Administrative Determination Under Review

The administrative determination subject to this appeal is the final result reached by the U.S. Department of Commerce ("Commerce" or the "Department") in the 2022-2023 administrative review of the antidumping duty order on *Utility Scale Wind Towers From the Republic of Korea*, 90 Fed. Reg. 19,672 (Dep't of Commerce May 9, 2025) and accompanying Issues and Decision Memorandum for the Final Results of the 2022-2023 Administrative Review of the Antidumping Duty Order on Utility Scale Wind Towers from the Republic of Korea (Dep't of Commerce May 2, 2025), available at https://access.trade.gov/public/FRNoticesListLayout.aspx at barcode 4756024-02 (last visited Nov. 7, 2025) ("Final Decision Memorandum").

### B.     Issues Presented

(1) Whether Commerce erred in accepting Dongkuk S&C Co. Ltd.'s ("Dongkuk") unadjusted conversion costs where differences in these costs were not attributable to the subject merchandise's physical characteristics and where Commerce failed to consider the three most important physical characteristics of subject merchandise—type, weight, and height—in its analysis.

(2) Whether Commerce erred in relying on financial information from an unprofitable company's [                                    ] in a previous period of review when selecting among alternative sources for constructed value ("CV") under 19 U.S.C. § 1677b(e)(2)(B)(iii).

### C.    Request for Court Order and Relief Sought

The WTTC respectfully requests that the Court remand the challenged agency action for further consideration regarding the issues identified in Subsection B above.

## II.    ARGUMENT

### A.    Commerce's Decision to Accept Unadjusted Conversion Costs that Differed in Ways Unrelated to the Physical Characteristics of the Merchandise Was Unlawful

#### 1.    Standard of Review

In reviewing Commerce's decisions in administrative reviews, the Court will "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1). The agency acts unlawfully when it deviates from established practice without providing a satisfactory explanation. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("{I}t is well-established that 'an agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently.'"); *see also NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009) ("Once Commerce establishes a course of action . . . Commerce is obliged to follow it until Commerce provides a sufficient, reasoned analysis explaining why a change is necessary.").

Moreover, substantial evidence is measured by the entire record, and Commerce "must take into account whatever in the record fairly detracts from its weight," including "contradictory

evidence or evidence from which conflicting inferences could be drawn." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F. 3d 978, 985 (Fed. Cir. 1994). The agency fails to act consistently with the standard of review where it "offer{s} an explanation for its decision that runs counter to the evidence" or where it does not articulate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

> ### 2.    Commerce Arbitrarily Departed from Its Established Practice of Adjusting Conversion Costs That Are Unrelated to the Physical Characteristics of the Subject Merchandise

Commerce erred when it failed to adjust conversion costs that differed among products in ways that were not tied to the physical characteristics of Dongkuk's merchandise. Commerce may only rely on a respondent's reporting of costs based on the respondent's books and records, "if such records . . . reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A). Commerce has long understood, and the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has approved, that the costs associated with the production and sale of the merchandise are those attributable to different physical characteristics of the merchandise. *See Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1365-66 (Fed. Cir. 2014); *see also* Issues and Decision Memorandum for the Final Affirmative Determination and Final Negative Critical Circumstances Determination in the Less-Than-Fair-Value Investigation of Carbon and Alloy Steel Wire Rod from the Republic of Korea (Dep't of Commerce Mar. 19, 2018), available at https://access.trade.gov/Resources/frn/summary/korea-south/2018-06143-1.pdf at Barcode 3685100-01 (last visited Nov. 7, 2025) at cmt. 1 ("*Carbon and Alloy Wire Rod from Korea*").

According to the Federal Circuit, this understanding is consistent with the principle that "physical differences in product 'generally account' for major differences in costs." *Thai Plastic Bags Indus. Co.*, 746 F.3d at 1368 (quoting *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,339 (Dep't of Commerce Feb. 27, 1996)). In fact, Commerce describes "allocating costs based on physical characteristics" as "the primary factor in a cost analysis." *Id.* at 1366. Where costs are not based on physical characteristics, Commerce will adjust the respondent's costs to ensure that the dumping calculation is not distorted due to a convention of the respondent's reporting scheme. Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Common Alloy Aluminum Sheet from Italy (Dep't of Commerce Mar. 1, 2021), available at https://access.trade.gov/Resources/frn/summary/italy/2021-04739-1.pdf at barcode at 4093353-02 (last visited Nov. 7, 2025) at 34. (explaining that Commerce re-allocated per-unit direct labor, variable overhead, and fixed overhead costs due to variances caused by "differences in rolling time, production quantities, etc."); Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from Indonesia (Dep't of Commerce June 29, 2020), available at https://access.trade.gov/Resources/frn/summary/indonesia/2020-14532-1.pdf    at barcode: 3993284-02 (last visited Nov. 7, 2025) at cmt. 5 ("*Wind Towers from Indonesia* Inv. Memorandum").

As an initial matter, Dongkuk acknowledges that its reported conversion costs vary in ways unrelated to the physical characteristics of its merchandise. According to Dongkuk, its conversion costs are "akin to fixed costs that are not impacted by differences in product characteristics." Dongkuk's Response to Pre-Preliminary Cmts., CD 43, PD 73 at 2 (Aug. 26, 2024) ("Dongkuk Pre-Prelim Resp."). Rather, Dongkuk allocates conversion costs according to monthly production

quantities on a project-specific basis. *See id.* As a result, a project's unit conversion costs will

[                                                    ], even where Dongkuk produces the same models of

towers each month.  *See* Dongkuk Section D Supplemental Questionnaire Response, CD 24-35,

PD 53-55 at Exhibit SD-32 (Aug. 7, 2024) ("Dongkuk Supp. D").[1] Monthly project-specific

production volumes have no relation to, and do not depend upon, the physical characteristics of

the wind towers being produced. Whether Dongkuk decided to make more Model A towers than

Model B towers in May, or produces only Model A towers in June, is untethered from the tower

models' height, weight, or physical characteristics.

In addition to Dongkuk's plain statements confirming that its conversion costs vary in ways

unrelated to the physical characteristics of its goods, WTTC presented Commerce with a per-

section analysis comparing the conversion costs among Dongkuk's towers.[2]  This analysis bore

out Dongkuk's statement that its conversion costs are "not impacted by differences in product

characteristics." Dongkuk Pre-Prelim Resp. at 2.

---

[1]     Additionally, though Commerce highlights the "project-specific" nature of Dongkuk's cost
accounting and reporting, *see* Final Decision Memorandum at 11, a single project [
                                       ]. *See* Dongkuk Supp. D at Exhibit SD-32.

[2]     WTTC based its per-section analysis on Commerce's public description of its methodology
for assessing cost differences among different CONNUMs in the *Wind Tower Indonesia*
antidumping investigation. Specifically, in the public cost memorandum accompanying
Commerce's decision memorandum, Commerce describes comparing CONNUMs on a per-
section basis. Similarly, Commerce's summary of the parties' argument in its issues and decision
memorandum describes a per-section analysis and the potential for smoothing costs on a per-
section basis. *See Wind Tower Indonesia* Inv. Memorandum at 14-15 (referencing respondent's
claim that Commerce should not "calculate a single cost per-section for essentially all cost
elements . . ."). While Commerce refers to a per-metric ton ("MT") analysis/smoothing in its
substantive discussion of the issue, this appears to be the inadvertent result of cutting and pasting
language from the agency's earlier discussion of its plate cost smoothing analysis, which was
performed on a per-MT basis. *See id.* at 17-19.

WTTC's analysis laid out the conversion costs for each model, or "CONNUM," of subject goods, to demonstrate the variance in conversion costs unrelated to physical characteristics. *See* WTTC Pre-Preliminary Comments Cmts., CD 36-37, PD 59 at Exhibit 1 (Aug. 15, 2024) ("WTTC Pre-Prelim Cmts.").[3] A CONNUM is a series of coded numbers that represent the physical characteristics of each product.[4] The CONNUM is Commerce's guide for determining how costs differ between products with different physical characteristics. See *Dongkuk S&C Co. v. United States*, 134 F.4th 1320, 1329 (Fed. Cir. 2025); *Carbon and Alloy Wire Rod from Korea* at cmt. 1 ("Commerce normally does not rely on a respondent's reported costs where cost differentials between CONNUMs are driven by factors other than the CONNUMs physical characteristics."). The CONNUM is structured such that higher importance physical characteristics are placed earlier in the CONNUM while lower importance characteristics appear later. *See Dongkuk S&C Co. v. United States*, 548 F. Supp. 3d 1376, 1380 (Ct. Int'l Trade 2021). The price-driving physical characteristics are placed earlier in the CONNUM to ensure the most accurate price comparison. *See id.* Therefore, the earlier CONNUM characteristics will reflect the physical characteristics that have the greatest impact on cost.

---

[3]    WTTC's analysis reproduces CONNUMs and costs found in Dongkuk's cost of production database accompanying Dongkuk's Section D questionnaire response. For the Court's convenience, WTTC discusses Dongkuk's CONNUMs and costs by referencing WTTC's analysis.

[4]    The CONNUM in this case has 11 fields. *See, e.g.*, DOC Initial Questionnaire, PD 18-19 at B-8 – B-13 (Nov. 15, 2023). Each field represents a characteristic of a utility scale wind tower (listed in order of descending importance). These 11 fields are listed in the following order in the CONNUM: (1) Type, (2) Weight of Tower/Section, (3) Height of Tower/Section, (4) Total Sections, (5) Type of Paint Coating, (6) Metalizing, (7) Electrical Conduit – Bus Bars, (8) Electrical Conduit – Power Cables, (9) Elevators, (10) Number of Platforms, (11) Other Internal Components. *See id.*

WTTC's analysis indicated that per-section conversion costs vary between CONNUMs without regard to physical characteristics—particularly the highest-order characteristics of type, weight, and height. *See* WTTC Pre-Prelim Cmts. at Exhibit 1. WTTC compared conversion costs on a per-section basis, which allowed a uniform comparison across multiple production quantities and tower sizes. The analysis demonstrated that [    ] of [    ] sections—or [      ]% of sections—had conversion costs that deviated significantly from the overall per-section conversion costs.[5] *See id.* Per-section conversion cost variances ranged widely between CONNUMs—from [      ]% to [      ]%. *See id.* Overall, the weighted average variation for all CONNUMs was [      ]%. *See id.*

Differences in physical characteristics cannot explain these variances. WTTC highlighted this fact by ordering the CONNUMs from lightest to heaviest (*i.e.*, based on weight, the second CONNUM characteristic).[6] Presumably, if Dongkuk's costs were related to the physical characteristics of the merchandise, CONNUMs with similar weights should have similar per-section conversion costs. However, WTTC's analysis demonstrates that CONNUMs with similar weights have vastly different per-section conversion costs. *See id.* (*compare* [      ], *with* [      ]). Conversely, CONNUMs with much different weights had conversion costs that were nearly the same. *See id.* (*compare* [      ] *with* [      ]); *id.* (*compare* [      ] *with* [      ] *and* [      ]).

---

[5]    Ten percent is Commerce's standard threshold for determining whether the variance in costs between CONNUMs is significant. *See Wind Towers from Indonesia* Inv. Memorandum at cmt. 5 (citing Commerce's analysis in its accompanying cost calculation memorandum, which includes the ten percent deviation threshold in a public header).

[6]    The first CONNUM characteristic indicates whether the product is a complete tower or a single section. Because [      ] CONNUM reflected [                ], weight and height are the most relevant CONNUM characteristics. *See* WTTC Pre-Prelim Cmts. at Exhibit 1.

There is also no apparent relationship between physical characteristics and per-section conversion cost amounts. For example, [          ] is the heaviest CONNUM but has per-section conversion costs [                                    ] CONNUMs. *See id.* Moreover, the [          ] CONNUM ([        ]) has average per-section conversion costs that are [          ]. *See id*. Additionally, variations in conversion costs could not be attributable to differences in lower-order physical characteristics because [                                    ] product characteristic coding for PAINT, METAL, USBAR, LIFT, and INTERNAL, and [                    ]. *See* WTTC Case Brief, CD 63, PD 109 at 23 (Jan. 22, 2025) ("WTTC Case Br.") (containing a chart comparing similarities in the remaining CONNUM characteristics).

As discussed, Commerce's normal practice is to adjust for costs that bear no obvious relation to the physical characteristics of the subject merchandise. Dongkuk acknowledges it allocates conversion costs on a monthly basis in a manner unrelated to the physical characteristics of its merchandise, and the WTTC has shown that this allocation method results in large deviations in per-unit conversion costs between CONNUMs that do not correspond to differences in the most important physical characteristics. By refusing to adjust Dongkuk's conversion costs to more accurately reflect the cost of producing the subject merchandise, Commerce violated its longstanding practice – a practice exists to comply with 19 U.S.C. § 1677b(f)(1)(A).

### 3.    Commerce's Conversion Cost Analysis is Factually and Logically Flawed

Commerce justified relying on Dongkuk's unadjusted conversion costs based on an unreasonable analysis that is not supported by substantial evidence. Commerce's analysis contains three critical flaws. First, Commerce erroneously conflated conversion costs and plate costs as a

basis to disregard the three most important physical characteristics—type, height, and weight. Second, Commerce's analysis improperly excluded [     ] models from consideration in its analysis. Finally, Commerce based its conclusions, in part, on the rationale that towers with the same number of sections will be produced in similar quantities, which the record does not support.

Unlike WTTC's analysis, which compares conversion costs on a uniform per-section basis across all CONNUMs and CONNUM characteristics, *see* WTTC's Pre-Prelim Cmts. at Exhibit 1, Commerce's analysis disregarded the three most important physical characteristics—type, height, and weight. *See* Final Decision Memorandum at 11; *see also* Commerce Final Analysis Memorandum, CD 66-67, PD 119 at Attachment 1 (May 2, 2025) ("DOC Final Analysis Memo"). Commerce claimed that it could validly disregard the three highest-order physical characteristics when analyzing conversion costs because it "already analyzed how the type, height, and weight of each tower impacts {sic} the steel plate costs for the tower" and adjusted the plate costs to compensate for those differences unrelated to physical characteristics. *See* Final Decision Memorandum at 12. Instead, Commerce's analysis compares conversion costs between CONNUMs according to the <u>fourth</u> most influential physical characteristic (*i.e.*, number of sections in a given tower model). *See id.* On this basis, Commerce claimed that there is no significant variance in conversion costs among tower models with the same number of sections.

However, Commerce's analysis illogically conflates plate costs with conversion costs. Dongkuk's total costs of manufacturing are comprised of four components (1) direct materials, (2) direct labor, (3) variable overhead costs, and (4) fixed overhead costs. *See* Dongkuk Section D Questionnaire Response, CD 9-19, PD 34-36 at D-33 – D-34 (Jan. 10, 2024). Steel plates are one of Dongkuk's primary raw materials, and their cost is therefore reported as part of Dongkuk's direct material costs. *See id.* at D-32 (explaining that Dongkuk's reported direct material costs are

the sum of Dongkuk's plate costs, flanges, and sub-materials). Conversion costs, on the other hand, are "the sum of direct labor, variable overhead, and fixed overhead costs." *See* Final Decision Memorandum at 10. Commerce adjusted Dongkuk's total cost of manufacturing to replace Dongkuk's reported plate costs with an adjusted plate cost to mitigate differences unrelated to the products' physical characteristics. *See* Commerce's Preliminary Margin Calculation Memorandum, CD 50-55, PD 91 at 1-2 (Sept. 6, 2024). This adjustment of plate costs did not alter the labor, variable overhead, or fixed overhead components of Dongkuk's total cost of manufacturing. In other words, even with the plate cost portion of Dongkuk's total cost of manufacturing adjusted, the conversion cost component continues to reflect any differences unrelated to physical characteristics. Commerce's decision to ignore height and weight in its conversion cost analysis based on its plate cost adjustment is therefore unreasonable and unsupported.

Additionally, Commerce unreasonably limited its analysis to only a portion of Dongkuk's CONNUMs. *See* DOC Final Analysis Memo at Attachment 1. During the period of review, Dongkuk sold [     ] different CONNUMs consisting of [     ] total sections. *See id.* Yet, by only comparing conversion costs among CONNUMs with the same number of sections, Commerce ignored [     ] CONNUMs accounting for more than [          ] of total sections. *See id.* This includes the CONNUM accounting for the [          ] number of sections produced. *See id.* This selective framing further undermines the credibility of Commerce's analysis.

Finally, there is no basis for Commerce's conclusion that "towers with the same number of sections would have a similar production quantities {sic} and, therefore, similar conversion costs." Final Decision Memorandum at 12. Commerce's own analysis demonstrates that towers with the same number of sections have different production quantities. *See* DOC Final Analysis Memo at

Attachment 1. For example, there are [      ] CONNUMs comprised of [                  ], yet Dongkuk

produced [                                      ]. *See id.* (*compare* [        ] *and*

[        ]). Commerce's conclusion is either incorrect on its face or requires clarification.

In light of these flaws, the Court should remand Commerce's analysis of Dongkuk's

conversion costs for further consideration. As explained above, Commerce failed to appropriately

assess the variances in Dongkuk's conversion costs. Commerce further failed to appropriately

explain and support its decision to ignore the three highest-order CONNUM characteristics and,

instead, compared conversion costs across CONNUMs based on the fourth CONNUM

characteristic, *i.e.*, number of sections in a given tower model. Commerce also improperly

disregarded [        ] CONNUMs in its analysis and made unfounded claims about the relationship

between tower sections and production quantities.

> **B.** **Commerce's Decision to Rely on Dongkuk's CV Profit Ratio from the Previous Review was Not in Accordance with Law or Supported by Substantial Evidence**

> **1.** **Standard of Review**

In reviewing Commerce's decisions in administrative reviews, the Court will "hold

unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1). The

agency acts unlawfully when it deviates from established practice without providing a satisfactory

explanation. *SKF USA Inc.*, 263 F.3d at 1382 ("{I}t is well-established that 'an agency action is

arbitrary when the agency offer{s} insufficient reasons for treating similar situations

differently.'"); *see also NMB Sing.*, 557 F.3d at 1328 ("Once Commerce establishes a course of

action . . . Commerce is obliged to follow it until Commerce provides a sufficient, reasoned

analysis explaining why a change is necessary.").

Moreover, substantial evidence is measured by the entire record, and Commerce "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." *Suramerica de Aleaciones Laminadas, C.A.*, 44 F. 3d at 985. The agency fails to act consistently with the standard of review where it "offer{s} an explanation for its decision that runs counter to the evidence" or where it does not articulate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

### 2. Commerce Departed from Its Standard Practice of Rejecting Information from Unprofitable Companies when Selecting Between Potential Sources Under 19 U.S.C. § 1677b(e)(2)(B)(iii)

Where a respondent has no above-cost sales in the home market or a third-country market, Commerce will base normal value on a "constructed value" of the merchandise. *See* 19 U.S.C. § 1677b(a)(4). The constructed value of the merchandise must include "amounts incurred" for "selling, general, and administrative expenses, and for profits . . . ." *See id.* § 1677b(e)(2). Where, as here, there are no above-cost sales from which to derive selling expenses and profits, *id.* § 1677b(e)(2)(A), Commerce relies on one of three "alternative methods" to derive these expenses. *Id.* § 1677b(e)(2)(B); *see also* Final Decision Memorandum at 3-4. These statutory alternatives are:

**(i)** the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise ("Alternative (i)"),

**(ii)** the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general,

and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

**(iii)**    the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise ("Alternative (iii)").

In its preliminary decision, Commerce indicated that it would use Dongkuk's information from a prior review under Alternative (i) to derive a CV profit ratio. *See* Decision Memorandum for the Preliminary Results of the Administrative Review of the Antidumping Duty Order on Utility Scale Wind Towers from Korea; 2022-2023 (Dep't of Commerce Sept. 6, 2025) at barcode 4627647-02 (last visited Nov. 7, 2025) at 11 (citing 19 U.S.C. § 1677b(e)(2)(B)(i)). According to Commerce, Dongkuk's prior review information was the best option because it reflected "Dongkuk's own home market sales of wind towers made in the ordinary course of trade in the prior review." *Id.* However, after the WTTC explained that Alternative (i) requires the agency to rely on a respondent's sales of "comparable merchandise" in the current segment of the proceeding,  *see* WTTC Case Br. at 4-7 (*citing Husteel Co. v. United States*, 471 F. Supp. 3d 1349, 1365 (Ct. Int'l Trade 2020)), Commerce changed course and rooted its final decision in Alternative Method (iii). *See* Final Decision Memorandum at 4.

Commerce has a well-established practice for selecting among potential proxies for CV ratios under Alternative (iii). In general, the goal of Commerce's CV analysis is "find{ing} a good proxy (or surrogate) for the profits that the respondent can fairly be expected to build into a fair sales price of the particular merchandise." *Mid Continent Steel & Wire, Inc. v. United States,* 941 F.3d 530, 542 (Fed. Cir. 2019) (citing *SKF USA Inc.*, 263 F.3d at 1373). Put otherwise, Commerce

is searching for a source that will approximate a respondent's "home market profit experience." *Husteel Co. v. United States*, 98 F. Supp. 3d 1315,1349 (Ct. Int'l Trade 2015); *see also Thai I-Mei Frozen Foods Co. v. United States*, 572 F. Supp. 2d 1353, 1368 (Ct. Int'l Trade 2008) ("Commerce's task {is} to estimate, reasonably and fairly, a profit rate that {the respondent} would have realized from sales in its home market.").

Therefore, a threshold question in Commerce's Alternative (iii) analysis is whether a potential source of CV data fairly reflects a producer's profit experience. When selecting among Alternative (iii) sources for CV profit data, "{i}t is {Commerce's} practice not to rely on companies with zero-profit rates." *See* Issues and Decision Memorandum for the Less-Than-Fair-Value Investigation of Electrolytic Manganese Dioxide from Australia (Dep't of Commerce Aug. 14, 2008) at cmt. 1, available at https://access.trade.gov/Resources/frn/summary/australia/E8-18848-1.pdf (last visited Nov. 7, 2025) (citing Notice of Final Determination of Sales at Less Than Fair Value: Polyvinyl Alcohol from the Republic of Korea (Dep't of Commerce Aug. 11, 2003) at cmt. 1, available at https://access.trade.gov/Resources/frn/summary/korea-south/03-20320-1.pdf) (last visited Nov. 7, 2025); *see also* Issues and Decision Memorandum for the Final Results of the 2018-2019 Administrative Review of the Antidumping Duty Order on Certain Steel Nails from the Sultanate of Oman (Dep't of Commerce Feb. 24, 2021) at 14, available at https://access.trade.gov/Resources/frn/summary/oman/2021-05304-1.pdf (last visited Nov. 7, 2025) (clarifying that financial information from an unprofitable company "should not be included as a viable candidate for the CV profit calculation."); Issues and Decision Memorandum for the Final Affirmative Determination in the Antidumping Duty Investigation of Biodiesel from Indonesia (Dep't of Commerce Feb. 20, 2018) at cmt. 5, available at https://access.trade.gov/Resources/frn/summary/indonesia/2018-04138-1.pdf (last visited Nov. 7,

2025) ("*Biodiesel from Indonesia* IDM"). Likewise, Commerce will not use a profitable company's financial information when the relevant product segment was not profitable. Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less-Than-Fair-Value of Frozen Warmwater Shrimp from Indonesia (Dep't of Commerce Oct. 21, 2024) at cmt. 9, available at barcode 4651805-02 (last visited Nov. 7, 2025); Decision Memorandum for the Preliminary Determination in the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from Malaysia (Dep't of Commerce May 18, 2021) at 12, available at https://access.trade.gov/Resources/frn/summary/malaysia/2021-10918-1.pdf (last visited Nov. 7, 2025) ("*Wind Towers from Malaysia* PDM") (unchanged in final). Additionally, in the analogous context of selecting financial ratios in nonmarket economy proceedings, Commerce has clarified that its preference "is to use the financial statements of companies that have earned a profit and disregard the financial statements of companies that have zero profit when there are other financial statements that have earned positive profit on the record." Issues and Decision Memorandum for the Final Results of 4th Administrative Review and 2nd New Shipper Review: Certain Frozen Fish Fillets from the Socialist Republic of Vietnam ("Vietnam") (Dep't of Commerce Mar. 9, 2009) at cmt. 1, available at https://access.trade.gov/Resources/frn/summary/vietnam/E9-5744-1.pdf (last visited Nov. 7, 2025).

Here, Commerce reviewed seven potential sources of CV profit data—Dongkuk's CV profit ratio calculated in the 2021-2022 administrative review, based on its 2022 financial information, and six contemporaneous financial statements from other Korean producers. *See* Final Decision Memorandum at 5; *see also* Dongkuk CV Information, CD 38-42, PD 62-66 at Exhibit CV-1 (Aug. 23, 2024) ("Dongkuk CV Cmts."). Dongkuk's information from the prior review was derived from [                                    ]. Dongkuk CV Cmts. at Exhibit CV-1,

Attachment, p. 21. Dongkuk sold this [                                    ] in a year that Dongkuk was otherwise

unprofitable on a company-wide basis.  *See* Dongkuk Section A Questionnaire Response, CD 5-

8, PD 27-30 at Exhibit A-14 (Dec. 15, 2023) (*see* Income Statement) ("Dongkuk Section A").

Moreover, [        ] Dongkuk's [                                                        ]. Dongkuk CV

Cmts. at Exhibit CV-1, Attachment, p. 21. Commerce ultimately selected Dongkuk's information

from the previous review, though it mischaracterized this data as "profit from wind towers" and

"above-cost sales of wind towers." Final Decision Memorandum at 5-7.

Under Commerce's practice, Dongkuk's 2022 financial information should have been

disqualified as a source CV data because the company was not profitable that year. Specifically,

Dongkuk reported a loss before taxes of 11,850,226,833 KRW. *See* Dongkuk Section A at Exhibit

A-14 (*see* Income Statement). [

                                                                    ] in the 2021-2022 review

period [                          ], including [

            ]. Dongkuk CV Cmts. at Exhibit CV-1, Attachment, pp. 11, 23. Dongkuk's substantial

losses in 2022 should have rendered it a "non-viable candidate" for CV profit.

In justifying its reliance on the prior review data, Commerce conceded that Dongkuk was

unprofitable on a company-wide level and that it normally rejects unprofitable sources. Final

Decision Memorandum at 6. However, it reasoned that it normally "evaluates a source's

profitability on a more specific basis than the company-wide level if such information is on the

record." *Id.* Commerce highlighted two decisions where it rejected data sources relating to

companies that reported losses in the segment related to subject merchandise. *See id.* at 6-7 (citing

*Wind Towers from Malaysia* PDM at 12 (featuring sources that were unprofitable on an overall or

segment-specific basis) and *Biodiesel from Indonesia* IDM at 34 (featuring a source that was

profitable overall but unprofitable on a segment-specific basis). Rather than elucidate Commerce's basis for relying on Dongkuk's data, these decisions reinforce that Commerce's stringently rejects unprofitable sources—scrutinizing profitability to the segment even where the company is profitable overall. *See Biodiesel from Indonesia* IDM at 7-8.

Importantly, Dongkuk was unprofitable in 2022 not just at a company-wide level, [

]. Dongkuk's CV ratios from the previous review are based on [     ] home market sales made from August 1, 2021 through July 31, 2022. Dongkuk CV Cmts. at Exhibit CV-1, Attachment 1, p. 20. These [     ] sales reflected a total of [     ] towers, with [        ] accounting for [              ]. *Id.* at Exhibit CV-1, Attachment, p. 16 (showing product quantity (PRODQTY) values for each sale). [             ] sales (*i.e.*, [        ] towers) had [

]. *Id.* at Exhibit CV-1, Attachment, pp. 20-21. The [          ] towers yielded [        ] profit rates of [     ]%, [     ]%, and [     ]%. *See id.* at Exhibit CV-1, Attachment, p. 22.[7] Total costs for all Dongkuk's home market tower sales were [

]. *See id.* at Exhibit CV-1, Attachment, p. 22-23.[8] Yet, despite these [                ] on home market sales, Commerce relied on Dongkuk's entire profit experience from the [   ]% above-cost rate of [            ]. *See id.* at Exhibit CV-1,

---

[7]     Commerce's CV profit rate on individual sales is derived from the following equation: [                                          ].

[8]     The sum of HMNPRICOP (net price) for all Dongkuk's home market tower sales was [                ] (*i.e.*, [

]). *See* Dongkuk CV Cmts. at Exhibit CV-1, Attachment, p. 22-23. The sum of costs for all towers was [                ] (*i.e.*, [

]). *See id.*

Attachment, pp. 22, 25; Final Decision Memorandum at 7. Commerce has not adequately explained or supported its conclusion that a [                    ] can redeem a source that is unprofitable overall and [                                                        ]. Final Decision Memorandum at 7. Commerce's logic is inconsistent with its prior practice to disregard information from companies that are unprofitable on an overall or segment-specific basis.

In sum, Commerce erred in its Alternative (iii) analysis by selecting financial information from a company that was unprofitable—both on a company-wide basis [

            ]. Commerce abandoned its standard approach and failed to properly consider its past practice. Rather, the misapplied past agency precedents to support its chosen path. As such, Commerce's CV selection should be remanded for further consideration of the profitable Alternative (iii) sources.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, WTTC respectfully submits that the Court should remand the Department's Final Results in the 2022-2023 administrative review of utility scale wind towers from the Republic of Korea for further consideration.

Respectfully submitted,

*/s/ Robert E. DeFrancesco, III*
Robert E. DeFrancesco, III, Esq.
Maureen E. Thorson, Esq.
Laura El-Sabaawi, Esq.
John Allen Riggins, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Wind Tower Trade Coalition*

Dated:  November 10, 2025

**Court No. 25-00104**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Scheduling Order (August 16, 2025), ECF No. 21, the undersigned certifies that this brief complies with the word limitation requirement. The word count for Memorandum of Law in Support of Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 5,251 words.

<u>*/s/ Robert E. DeFrancesco, III*</u>
(Signature of Attorney)

<u>Robert E. DeFrancesco, III</u>
(Name of Attorney)

<u>Wind Tower Trade Coalition</u>
(Representative Of)

<u>November 10, 2025</u>
(Date)