IN UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | | |
|---|---|---|
| WIND TOWER TRADE COALITION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 25-00104 |
| | ) | **NONCONFIDENTIAL VERSION** |
| UNITED STATES, | ) | BPI omitted at pages 6-8, 11, 14, |
| | ) | 18-20, 23-24, 30-31 |
| Defendant, | ) | |
| and | ) | |
| | ) | |
| DONGKUK S&C CO., LTD., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:
KARL MUELLER
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20230

TATE NATHAN WALKER
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C., 20044
Tel: (202) 307-0163
Email: Tate.Walker@usdoj.gov

February 9, 2025                    *Attorneys for Defendant*

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | |
|---|---|
| _____ ) | |
| WIND TOWER TRADE COALITION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Court No. 25-00104 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| and ) | |
| ) | |
| DONGKUK S&C CO., LTD., ) | |
| ) | |
| Defendant-Intervenor. ) | |
| _____ ) | |

**ORDER**

On consideration of plaintiff's motion for judgment on the administrative record,

defendant's response, and all other pertinent papers, it is hereby

ORDERED that the motion is denied; and is further

ORDERED that judgment is entered for the United States.

Dated: _____            _____
New York, NY                                              SENIOR JUDGE

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ..................................................................2

    I.    The Administrative Determination under Review ...................................2

    II.    Issues Presented for Review .....................................................................2

STATEMENT OF FACTS ........................................................................................2

    I.    Legal Framework ......................................................................................2

    II.    Procedural Background ..............................................................................6

SUMMARY OF ARGUMENT ................................................................................14

ARGUMENT ..........................................................................................................15

    I.    Standard Of Review ...............................................................................15

    II.    Commerce's Decision to Accept Dongkuk's Reported Conversion Costs is Supported by Substantial Evidence and in Accordance with Law ........16

        A.  Dongkuk Correctly Reported its Conversion Costs..........................16

        B.  The Supposed Flaws WTTC Points to in Commerce's Analysis were Explained by Commerce ..................................................................20

            1.  Commerce's Properly Chose to Analyze Whether Dongkuk's Per-Unit Conversion Costs Differed from the Average Per-Unit Conversion Costs for CONNUMs with the Same Number of Section .........................21

            2.  Commerce did not Unreasonably Limit its Analysis to a Portion of Dongkuk's CONNUMs...........................................................................23

        C.  Commerce did not Depart from its Standard Practice When it Refrained from Adjusting Dongkuk's Reported Conversion Costs....................24

    III.    Commerce's Decision to Rely on Dongkuk's CV Profit Ratio from the Previous Review is Supported by Substantial Evidence and in Accordance with Law.........26

CONCLUSION.......................................................................................................32

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                          **Page(s)**

*Atl. Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984)..................................................................................... 16

*Best Mattresses Intl. Co. Ltd. v. United States*,
   622 F. Supp. 3d 1347 (Ct. Intl. Trade 2023)................................................................ 32

*BlueScope Steel, Ltd. v. United States*,
   719 F.Supp.3d 1357 (Ct. Int'l Trade 2024) ............................................................ 24, 28

*Cleo Inc. v. United States*,
   501 F.3d 1291 (Fed. Cir. 2007)..................................................................................... 16

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966)....................................................................................................... 15

*Dongkuk S&C Co. v. United States*,
   600 F. Supp. 3d 1331 (Ct. Int'l Trade 2022) ................................................................. 3

*Edison Co. v. NLRB*,
   305 U.S. 197 (1938)....................................................................................................... 15

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996)....................................................................................... 16

*Goldlink Indus. Co. v. United States*,
   431 F.Supp.2d 1323 (Ct. Int'l Trade 2006) .................................................................. 16

*Hyundai Steel Company v. United States*,
   675 F. Supp. 3d 1307 (CIT 2023) ................................................................................. 29

*INS v. Elias-Zacarias*,
   502 U.S. 478 (1992)....................................................................................................... 16

*Mid Continent Steel & Wire, Inc. v. United States*,
   941 F.3d 530 (Fed. Cir. 2019)........................................................................... 28, 31, 32

*NEXTEEL Co. v. United States*,
   355 F.Supp.3d 1336 (Ct. Int'l Trade 2019) ................................................................... 4

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006)..................................................................................... 15

*SeAH Steel Corp. v. United States*,
   513 F. Supp. 3d 1367 (CIT 2021) ................................................................................. 29

*Shandong Rongxin Imp. & Exp. Co. v. United States,*
    203 F.Supp.3d 1327 (Ct. Int'l Trade 2017) ............................................................ 16

*Smith-Corona Grp. v. United States,*
    713 F.2d 1568 (Fed. Cir. 1983) ............................................................................. 16

*Thai Plastics Bags Indus. Co. v. United States,*
    746 F.3d 1358 (Fed. Cir. 2014) ............................................................................... 4

*Torrington Co. v. United States,*
    68 F.3d 1347 (Fed. Cir. 1995) ................................................................................. 2

*Unicatch Indus. Co., Ltd. v. United States,*
    539 F. Supp. 3d 1229 (Ct. Intl. Trade 2021) ........................................................ 32

*United States v. Eurodif S.A.,*
    555 U.S. 305 (2009) .............................................................................................. 15

*Xi'an Metals and Mins. Imp. & Exp. Co. v. United States,*
    50 F.4th 98 (Fed. Cir. 2022) ................................................................................... 3

*Wind Tower Trade Coalition v. United States,*
No. 24-00070, 2025 WL 3461684 (Ct. Intl. Trade Dec. 2, 2025) ......................... 8, 26

**Statutes**

19 U.S.C. § 1675(a)(2)(A) ........................................................................................ 2

19 U.S.C. § 1677b .............................................................................................. 9, 10

19 U.S.C. § 1677b(2)(A) ........................................................................................ 31

19 U.S.C. § 1677b(a) ............................................................................................... 2

19 U.S.C. § 1677b(b)(3) ..................................................................................... 4, 22

19 U.S.C. § 1677b(b)(3)(A) ..................................................................................... 4

19 U.S.C. § 1677b(e) ............................................................................................... 5

19 U.S.C. § 1677b(e)(2)(B) ............................................................................. passim

19 U.S.C. § 1677b(f)(1)(A) ........................................................................... 4, 14, 17

19 U.S.C. §§ 1677b(a)(1)(B) .................................................................................... 5

19 U.S.C. §§ 1677b(b) ............................................................................................. 3

19 C.F.R. § 351.404(b) ............................................................................................ 30

**Rules**

U.S. Ct. Int'l Trade R. 56.2 .................................................................................. 1, 2

**Administrative Determinations**

*Biodiesel from Indonesia: Final Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 8,835 (March 1, 2018) ............................................................................................ 29

*Certain Fish fillets from the Socialist Republic of Vietnam: Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews*, 74 Fed. Reg. 11,349 (Dep't Commerce Mar. 17, 2009) ...................................................................................................... 29

*Utility Scale Wind Towers from the Republic of Korea*, 90 Fed. Reg. 19,672 (Dep't Commerce May 9, 2025) ............................................................................................................ 2

*Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 85 Fed. Reg. 52,546 (Dep't of Commerce Aug. 26, 2020) ......................................................................................................... 6

*Utility Scale Wind Towers from the Republic of Korea*, 89 Fed. Reg. 16,544 (Dep't Commerce Mar. 7, 2024) ............................................................................................................ 8

*Utility Scale Wind Towers from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2021-2022; Correction*, 89 Fed. Reg. 22,372 (Dep't Commerce Apr. 1, 2024) ................................................................................................................. 8

*Utility Scale Wind Towers from Malaysia: Preliminary Determination of Sales at Not Less Than Fair Value and Postponement of Final Determination*, 86 Fed. Reg. 27,828 (Dep't Commerce May 24, 2021) ......................................................................................... 29

*Utility Scale Wind Towers From the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2021-2022*, 88 Fed. Reg. 60,929 (Dep't Commerce, Sep. 6, 2023) ................................................. 30

*Wind Towers from Indonesia* and *Common Alloy Aluminum Sheet from Italy: Final Affirmative Determination of Sales at Less than Fair Value (LTFV)*, 86 Fed. Reg. 13,309 (Dep't Commerce Mar. 8, 2021) ............................................................................................. 25

**Other Authorities**

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316 (1994) ...................................................................................................... 5, 12, 27

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | | |
|---|---|---|
| WIND TOWER TRADE COALITION, | ) | |
| Plaintiff, | ) | |
| v. | ) | Court No. 25-00104 |
| UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| DONGKUK S&C CO., LTD., | ) | |
| Defendant-Intervenor. | ) | |

### DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGEMENT ON THE ADMINISTRATIVE RECORD

Defendant, the United States, respectfully responds to the motion for judgement on the agency record submitted by plaintiff, Wind Tower Trade Coalition (WTTC), challenging the U.S Department of Commerce's (Commerce) final results in the administrative review of the antidumping duty order on utility scale wind towers (wind towers) from the Republic of Korea (Korea) for the period August 1, 2022, through July 31, 2023. WTTC Br., ECF Nos. 23-24 (Nov. 10, 2025). As demonstrated below, Commerce's final results are supported by substantial evidence and are otherwise in accordance with law. The Court should, therefore. deny WTTC's motion and enter judgment for the United States, sustaining Commerce's final results.

PUBLIC VERSION

## STATEMENT PURSUANT TO RULE 56.2

**I.    Administrative Determination Under Review**

The administrative determination under review is the 2022-23 administrative review of the antidumping duty order on *Utility Scale Wind Towers from the Republic of Korea*, 90 Fed. Reg. 19,672 (Dep't Commerce May 9, 2025) (*Final Results*) (P.R. 120), and the accompanying Issues and Decision Memorandum (IDM) dated May 2, 2025 (P.R. 118).

**II.    Issues Presented for Review**

1.    Whether Commerce's decision to accept Dongkuk S&C Co. Ltd.'s (Dongkuk) reported conversion costs is supported by substantial evidence and in accordance with law.

2.    Whether Commerce's decision to rely on Dongkuk's constructed value profit ratio from the previous review is supported by substantial evidence and in accordance with law.

## STATEMENT OF FACTS

**I.    Legal Framework**

The statute directs Commerce in antidumping proceedings to determine whether subject merchandise is being, or is likely to be, sold at less than fair value by comparing the United States price for imported merchandise (known as export price or constructed export price) with the merchandise's home market price (called normal value in the statute).  19 U.S.C. § 1675(a)(2)(A).  The statute further directs that "a fair comparison shall be made between the export price or constructed export price and normal value."  19 U.S.C. § 1677b(a); *see also Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (explaining that the statutory framework seeks "to produce a fair . . . comparison between foreign market value and

PUBLIC VERSION

United States price"). To this end, Commerce identifies the subject merchandise's commercially significant physical characteristics and uses them to establish control numbers, or CONNUMs,[1] for sales comparison purposes. *Xi'an Metals and Mins. Imp. & Exp. Co. v. United States*, 50 F.4th 98, 102 (Fed. Cir. 2022) ("Commerce defines CONNUMs by identifying 'key physical characteristics of the subject merchandise' that are 'commercially meaningful' in the United States marketplace and 'have an impact on costs of production.'" (citation omitted)).

When calculating normal value for antidumping comparisons, the statute authorizes Commerce to disregard sales if they have been made at less than the "cost of production" of the product (such sales are not in the "ordinary course of trade"). 19 U.S.C. §§ 1677b(b), 1677(15)(A). If there are no sales in the exporting country that remain after removing sales below the cost of production, Commerce will base normal value on a constructed value for the subject merchandise. *Id.* §§ 1677b(a)(4), (b)(1). Constructed value is essentially the cost of production plus profit. *See id.* § 1677b(e). The statute specifically defines constructed value as the sum of

> the cost of materials and fabrication or other processing of any kind employed in producing the merchandise during a period that would ordinarily permit the production of the merchandise in the ordinary course of trade, . . . the actual amounts incurred or realized . . . for selling, general and administrative expenses and profits in connection with the production and sale of a foreign like product.

---

[1] "A 'CONNUM' is a contraction of the term 'product control number,' and is Commerce's jargon for a unique product defined in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding. All products whose product hierarchy characteristics are deemed to be identical are part of the same CONNUM and are regarded as 'identical' merchandise" for the purposes of Commerce's margin calculations. *Dongkuk S&C Co. v. United States*, 600 F. Supp. 3d 1331, 1334 n.4 (Ct. Int'l Trade 2022). The physical characteristics defining a unique CONNUM vary from proceeding to proceeding depending on the scope of each proceeding as the definition of the subject merchandise changes. *Dongkuk*, 600 F. Supp 3d at 1334 n.4.

19 U.S.C. § 1677b(b)(3).

The cost of production is the amount equal to the sum of "the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business." 19 U.S.C. § 1677b(b)(3)(A). Commerce relies on a company's normal books and records for purposes of calculating cost of production (and constructed value) if they satisfy two condition: "{1} if such records are kept in accordance with the generally accepted accounting principles {(GAAP)} of the exporting country (or the producing country, where appropriate) and {2} reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A).

When the costs reported in a company's books are not reasonable (for example, if cost differences among products do not represent differences in their physical characteristics) Commerce may revise the costs. It is thus normal for Commerce to adjust costs and to address distortions when it encounters cost differences that are attributable to factors beyond differences in the products' physical characteristics. *See, e.g., Thai Plastics Bags Indus. Co. v. United States*, 746 F.3d 1358, 1367 (Fed. Cir. 2014) (explaining that, "if Commerce determines that costs reported by a respondent are 'shifted away from the production of the subject merchandise, or the foreign like product,' Commerce has the authority to 'adjust costs appropriately to ensure that {the costs} are not artificially reduced.'" (citation omitted)); *NEXTEEL Co. v. United States*, 355 F.Supp.3d 1336, 1361 (Ct. Int'l Trade 2019) ("{i}f factors beyond the physical characteristics influence the costs, however, Commerce will normally adjust the reported costs in order to reflect the costs that are based only on the physical characteristics.").

To produce a comparison between export price and normal value, Commerce must also determine whether there is a sufficient volume of sales on the home market to serve as a viable basis for calculating normal value.  19 U.S.C. §§ 1677b(a)(1)(B), (a)(4).  If there are not sufficient above-cost sales of the foreign like product in the comparison third country sales market or the home market, "five percent or more of the aggregate quantity (or value) of the subject merchandise sold in the United States," Commerce will calculate constructed value (CV) in accordance with 19 U.S.C. § 1677b(e).  *Id.* at § 1677b(a)(1)(B)(ii)(II).

That statute, in relevant part, provides three alternative methods of calculating CV profit ratios, with no particular hierarchy among the alternatives:

> (i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review . . . for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of product as the subject merchandise;
>
> (ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) . . . for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country; or
>
> (iii) the amounts incurred and realized . . . for profits, based on any *other reasonable method*

19 U.S.C. § 1677(b)(e)(2)(B) (emphasis added).[2]

---

[2]  Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316 (1994) (SAA) at 840 ("at the outset, it should be emphasized, consistent with the Antidumping Duty Agreement, new section 773(E)(2)(B) does not establish a hierarchy or preference among these alternative methods.  Further, no one approach is necessarily appropriate for use in all cases.").

## II.    Procedural Background

Commerce published an antidumping (AD) order on wind towers from Korea.  *Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 85 Fed. Reg. 52,546 (Dep't of Commerce Aug. 26, 2020).

In response to Commerce's notice for requests for administrative review of the *Order*, Commerce received requests from WTTC and Dongkuk to review Dongkuk, and Commerce initiated the requested review.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 71,829 (Dep't of Commerce Oct. 18, 2023) (P.R. 11). Commerce selected Dongkuk as the sole mandatory respondent because it was the only exporter with suspended entries of subject merchandise during the period of review (POR).  Respondent Selection (Nov. 14, 2023) (P.R. 17).  Commerce issued its initial questionnaire to Dongkuk to which Dongkuk responded.  Dongkuk Section A Questionnaire Response (Dec. 15, 2023) (Dongkuk AQR) (P.R. 27-30, C.R. 5-8); Dongkuk's Section B-D Questionnaire Responses (Jan. 11, 2024) (P.R. 34-36, C.R. 9-19) (Dongkuk IQR).  In the initial questionnaire, Commerce identified 11 relevant product characteristics for the utility wind towers at issue:  type, weight of the tower/section, height of the tower/section, total sections, type of paint coating, metalizing, electrical conduit – bus bars, electrical conduit – power cables, elevators, number of platforms, other internal components.  Commerce Initial Questionnaire (Nov. 15, 2023) (PD 18-19 at B-8 - B-13).

In these Questionnaire Responses, Dongkuk explained, in regard to cost allocation, that it

> maintains costs on a *project-specific basis* in the normal course of business.  And DKSC {Dongkuk} classifies the costs into *direct costs and indirect costs*.  Mostly, payment ledgers can be linked directly to specific projects, and thus direct costs take up approximately **[    ]** percent of total production costs.  *The costs that are not directly linked to projects are classified as indirect*

> *costs* and first allocated to each production process based on the
> allocation basis set by the nature of accounts and then subsequently
> allocated to each project based on the production quantity.  For
> example, DKSC classifies the employee labor costs for the
> company as indirect costs, and then allocates the same amounts to
> each production process.  The allocated labor costs for each
> process are assigned to production quantity of each project that
> passes through the process.

Dongkuk's Letter, "DKSC's Sections B, C, and D Questionnaire Responses," (January 10, 2024)

(P.R. 36, C.R. 11) (Dongkuk's IQR) at D-13 (emphasis added).  Dongkuk further explained this

project specific basis and how it accounted for direct costs:

> The production cost reported for each CONNUM normally
> comprises production costs incurred for *multiple independent
> projects*.  As explained above, DKSC maintains production
> costs on an *individual project basis*.  On the first worksheet of the
> exhibits, DKSC identified the unique project and the total
> production costs incurred during the cost reporting period for the
> project according to the detailed cost components.  DKSC reported
> these cost elements based on its monthly cost records for each
> project, which DKSC accumulated to derive the total project costs.

Dongkuk's IQR at D-28 (emphasis added).  Dongkuk reported its "direct raw material costs

consist of steel plate and flanges along with internals such as platform and mechanical

accessories that it turns into wind towers" and provided weight and height characteristics,

amongst others.  Dongkuk's IQR at D-20, Exhibit D-1.  Commerce later issued supplemental

questionnaires, to which Dongkuk responded.  *See, e.g.*, Dongkuk's Supplemental Section D

Response (August 8, 2024) (Dongkuk's SDQR) (P.R. 55, C.R. 28-35).

Ahead of the *Preliminary Results*, WTTC contended that Dongkuk's conversion costs

should be adjusted "to reflect changes that are unrelated to the physical characteristics of the

merchandise."  WTTC Pre-Preliminary Comments (Aug. 15, 2024) (P.R. 59, C.R. 36-37, Exhibit

1) at 4.  WTTC contended that "{w}hatever method Dongkuk used to allocate its conversion

costs appears to be extremely imprecise, as evidenced by the resulting variation [

].” *Id.* at 3-4.  WTTC asserted that "the product characteristics do not explain the difference in conversion costs, as any per-section comparison should result in [

].” *Id.* at 6.  To support its claim, WTTC included an analysis of Dongkuk's reported conversion costs.  *Id.* at Ex. 1.  This analysis included Dongkuk's reported conversion costs by CONNUM, provided the number of sections per CONNUM, calculated the average variation of conversion costs per section of each CONNUM, and determined the number of sections, per CONNUM, for which the variation in average conversion costs [                                    ].  *Id.*

Dongkuk submitted rebuttal comments, contending that "{Dongkuk} had followed the same conversion cost reporting methodology that {Commerce} ha{d} reviewed and accepted in prior segments of this proceeding."  Dongkuk's Response to Pre-Prelim. Comments (Aug. 26, 2024) (P.R. 73, C.R. 43) (Dongkuk Resp. to Pre-Prelim Comments) at 1; *see, e.g., Utility Scale Wind Towers from the Republic of Korea*, 89 Fed. Reg. 16,544 (Dep't Commerce Mar. 7, 2024) (*Prior Review Results*), as corrected in *Utility Scale Wind Towers from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2021-2022; Correction*, 89 Fed. Reg. 22,372 (Dep't Commerce Apr. 1, 2024) and accompanying IDM at Comment 3; *see also Wind Tower Trade Coalition v. United States*, No. 24-00070, 2025 WL 3461684, at *1 (Ct. Intl. Trade Dec. 2, 2025).  Dongkuk submitted that WTTC's suggestion to use "weighted-average conversion costs to all CONUMs" would be inconsistent with this precedent and be less accurate "considering the project-specific nature of DKSC's cost accounting and reporting."  Dongkuk's Resp. to Pre-Prelim. Cmts. at 5.  Dongkuk explained that it includes both indirect and direct overhead costs and that "unlike direct costs such as raw materials, indirect costs are akin to fixed costs that are not impacted by differences in product characteristics."  *Id.* at 2.  Dongkuk further

explained that it used "actual manufacturing costs from its accounting system to calculate the conversions ratio" and departing from this approach "would introduce . . . distortions." *Id.* at 6.

Commerce provided the parties with an opportunity to comment and to submit new factual information on constructed value (CV) profit and selling expenses ahead of the *Preliminary Results*, to which both Dongkuk and WTTC availed themselves of–each making various submissions providing CV profit and selling expenses information. Dongkuk CV Profit and Selling Expense Comments (Aug. 23, 2024) (P.R. 62-66, C.R. 38-42); WTTC CV Profit and Selling Expense Comments (Aug. 23, 2024) (P.R. 67-72); WTTC CV Profit and Selling Expense Rebuttal Comments (September 3, 2024) (P.R. 79-82, C.R. 45-48).

In its *Preliminary Results* on September 13, 2024, Commerce preliminarily found no dumping. *Utility Scale Wind Towers from the Republic of Korea: Preliminary Results and Rescission of Review, in Part, of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 74,880 (Dep't Commerce Sept. 13, 2024) (*Preliminary Results*) (P.R. 92), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 84). Commerce did not adjust Dongkuk's conversion costs and used Dongkuk's CV profit and selling expense data from the prior administrative review. PDM at 9-11. In doing so, Commerce explained that it had "examined Dongkuk's cost data and determined that our quarterly cost methodology was not warranted" and applied Commerce's "standard methodology of using annual costs based on Dongkuk's reported data." PDM at 9.

Commerce explained that it, in accordance with 19 U.S.C. § 1677b, it "calculated COP {cost of production} based on the sum of costs of materials and fabrication of the foreign like product, plus amounts for general and administrative (G&A) expenses and financial expenses." PDM at 9-10. Commerce largely accepted Dongkuk's COP data, but Commerce did apply a

weighted average to the "steel plate input costs for all reported control numbers to mitigate the

material differences unrelated to the physical characteristics of the products" and made certain

adjustments to G&A expenses.  PDM at 10.  Commerce explained that

> Dongkuk reported significant steel plate cost differences between
> control numbers (CONNUMs).  We analyzed such differences and
> found, based on record evidence, that the differences in steel plate
> costs between CONNUMs do not appear to be related to
> differences in the physical characteristics of the products.
> Therefore, to mitigate the unreasonable cost differences unrelated
> to the product physical characteristics, we weight averaged the
> reported plate costs for all reported CONNUMs.

Preliminary Results Margin Calculation for Dongkuk S&C Co., Ltd. (Sept. 6, 2024 (Preliminary

Calculation Memorandum) (C.R. 50), at 1-2 and Attachment 5 (C.R. 52).

Because of the "absence of comparison market sales made in the ordinary course of

trade," Commerce was unable to use its "preferred method" and turned to the "three alternatives

outlined in 19 U.S.C. § 1677b(e)(2)(B)(i-)-(iii).  PDM at 11.  Commerce selected the first

statutory alternatives because it possessed "actual amounts incurred and realized by the specific

exporter or producer in connection with the production and sale of merchandise that is in the

general category of products as the subject merchandise."  *Id*.  The parties then filed case and

rebuttal briefs.

In its case brief, WTTC contended that Commerce should adjust Dongkuk's conversion

costs to mitigate cost differences that are not associated with physical characteristics of the

merchandise.  WTTC Case Br. (Jan. 22, 2025) (P.R. 109, C.R. 63) at 2.  WTTC maintained that

Dongkuk's allocation of conversion costs is unrelated to the physical characteristics of its

merchandise.  *Id.* at 20.  WTTC argued that Commerce incorrectly interpreted alternative I in

19 U.S.C. § 1677b(e)(2)(B), the use of actual selling expenses and profit, because it relied upon

"ratios derived from home market wind tower sales in the previous review," and Dongkuk was

also not profitable during that previous review.  *Id.* at 4.  WTTC additionally contended that Commerce should use financial statements of other companies that produce comparable merchandise to calculate CV profit and selling expenses.  *Id.* at 2-3; 10-18.

In response, Dongkuk asserted that Commerce should not apply WTTC's proposed adjustments to Dongkuk's conversion costs and, instead, that Commerce should continue to rely on Dongkuk's conversion costs as reported without resorting to "smooth{ing}."  Dongkuk Rebuttal Br. at 17 (P.R. 112, C.R. 64).  Dongkuk explains that direct material costs, as well as the direct portion of the variable overhead ('VOH') costs linked to specific projects, compromise [    ] percent of the {Dongkuk's} total cost of manufacturing."  *Id.*  However, "conversion costs only compromise [    ] percent of its total costs of manufacturing."  *Id.* at 18.  Dongkuk explained that its conversion costs constitute "direct labor, indirect VOH, and fixed overhead – and are allocated by dividing up the amount of work performed."  *Id.*  Although direct VOH is attributable to specific projects, indirect VOH is common costs not associated with any one project and is calculated monthly.  *Id.*  Dongkuk contended that WTTC's arguments overlook that unique costs are incurred to produce its individual wind towers.  *Id.* at 19.  Dongkuk also focuses on WTTC's concentration on only one CONNUM, the number of sections per wind tower, and ignoring the other "eleven enumerated physical characteristics."  *Id.* at 20.  Dongkuk points out that WTTC's analysis also fails because "wind towers are specialized projects and cannot be compared to each other."  *Id.*

Dongkuk also argued that use of Dongkuk's submitted sales data from the prior review as a source for CV profit and selling expense information was consistent with Commerce's practice, this Court's precedent, and proper with the facts on the record.  *Id.* at 3-9.  Lastly, Dongkuk

argued that the surrogate financial statements proposed by WTTC were deficient and should not be used by Commerce as a source for CV profit and expense information. *Id.* at 9-16.

In the final results, Commerce disagreed with WTTC and continued to use Dongkuk's sales data from the prior review to calculate CV profit and selling expenses and did not reallocate Dongkuk's conversion costs. IDM at 4, 10. Commerce explained that "in the absence of comparison market sales made in the ordinary course of trade . . ., we were unable to use our 'preferred method' and instead relied on one of the three alternatives outlined in sections 773(e)(2)(B)(i)-(iii)." IDM at 4. Because the statute, 19 U.S.C. § 1677b(e)(2)(B), creates no hierarchy, and the SAA gives discretion in selecting a method that best fits the information in the record, Commerce based its final result on the third alternative–"any other reasonable method"–a change from its use of the first alternative in the preliminary results. *Id.*; PDM at 11. Commerce explained that it made this change because it "not have information on the record representing the same general category of products as the subject merchandise sold by Dongkuk." IDM at 4. Commerce also could not use the second alternative "because there are no other mandatory respondents." *Id.* Thus, Commerce looked to the third statutory alternative. *Id.* at 4-5.

In making this decision, Commerce applied its long-standing practice of applying four criteria to evaluate financial statements: 1) the similarity of the potential surrogate company's business operations and products to respondent's business operations and products; 2) the extent to which the financial data of the surrogate company reflects sales in the home market; 3) the contemporaneity of the data to the period of review; and 4) the similarity of the customer base between a potential surrogate company and the respondent. *Id.* at 5.

Commerce found that Dongkuk's financial statements were the best in the record because "specificity outweighs its contemporaneity." *Id.* at 6. Further, of the record data, "Dongkuk's

own profit experience best represents profit from wind towers produced by a Korean producer in Korea." *Id.* at 6.  Commerce had routinely relied on such data in previous reviews.  *Id.* Commerce then went on to explain why each source of selling and profit data in the record was deficient, addressing each source of data one by one.  *Id.* at 6-10.

Commerce found Dongkuk's reported conversion costs, after verification of Dongkuk's responses, to be appropriate based on its reporting methodologies and its own cost accounting system.  *Id.* at 1-2, 12.  Commerce additionally found Dongkuk's CV profit and selling expenses data from the previous review to be the best information on the record, analyzing both Dongkuk's data and the other potential sources of CV profit and selling expense information on the record.  *Id.* at 7-9.  Commerce found that the proposed surrogate's financial statements did not reflect sales of wind towers, were marred with affiliated sales, or reflected subsidization.  *Id.*

Additionally, Commerce rejected WTTC's argument that the entirety of "Dongkuk's per-unit average conversion costs fluctuated in a way that is unrepresented of the differences in physical characteristics."  *Id.* at 12.  Commerce rejected WTTC's broad brushed argument, finding that "Dongkuk's costs are maintained in accordance with Korean GAAP; and (2) determined that Dongkuk's reported per unit conversion costs generally reflect the differences in the number of wind tower sections in each tower."  *Id.*  Commerce also added that this result is supported by its past practice in past reviews.  While acknowledging that it "was not bound by its determination in a separate segment of the proceeding," Commerce took such into account when examining all the evidence in the record.  *Id.* at 12-13.

Commerce found that in "comparing the per-unit conversion costs for CONNNUMs that have the same number of sections per tower," it found that a similar amount of time and "similar per-unit conversion costs" across products with "similar number of sections."  *Id.* at 12.

Commerce used its analysis in the Final Calculation Memorandum, finding that amongst the

74.132 percent of sections tested, the difference on average from physical characteristics costs

per section only varied from [                                    ].  Final Calculation Memorandum

(C.R. 66), at Attachment 1 (C.R. 67) (May 2, 2025).  Commerce also addressed WTTC's

arguments as to the low volume of sales used to calculate CV profit.  Final Calculation

Memorandum at 2.

## SUMMARY OF THE ARGUMENT

WTTC challenges Commerce's use of Dongkuk's reported conversion costs in dumping

margin calculations on the grounds that (1) Commerce unlawfully departed from its practice

when it did not adjust differences in conversion costs that were unrelated to the physical

characteristics of the subject merchandise; (2) Commerce conflated conversion costs and plate

costs as a basis to disregard certain physical characteristics in its analysis; (3) Commerce

incorrectly excluded certain CONNUMs from consideration by comparing costs among

CONNUMs with the same number of sections; and (4) Commerce departed from its practice

regarding rejection of information from unprofitable companies when selecting between

potential sources for constructed value.

Contrary to WTTC's contentions, the final results are supported by substantial evidence.

First, Commerce followed 19 U.S.C. § 1677b(f)(1)(A) by analyzing and then concluding that

Dongkuk's reported conversion costs based on its normal books and records reasonably reflected

the costs associated with the production and sale of wind towers.  Second, Commerce's

determination that Dongkuk's reported conversion costs were related to the physical

characteristics of the merchandise is supported by substantial evidence.  Third, Commerce did

not unlawfully depart from its practice when it declined to adjust differences in conversion costs

PUBLIC VERSION

because the record supports Commerce's finding that the identified cost differences were related to the wind towers' physical characteristics.  Fourth, Commerce did not unlawfully depart from its practice when it used Dongkuk's CV profit and sales data from the prior review.

Because Commerce's determination is supported by substantial evidence on the record and is otherwise in accordance with law the Court should deny WTTC's motion, sustain Commerce's determination, and enter judgement for the United States.

## ARGUMENT

## I.     Standard of Review

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence, or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions does not make Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  Thus, a party challenging an agency determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (cleaned up), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562-63 (Fed. Cir. 1984).

Additionally, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so

compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *see also Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F.Supp.3d 1327, 1338 (Ct. Int'l Trade 2017) (recognizing a deference to Commerce's factual findings). It is thus improper to overturn a determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted), and the Court will not substitute its judgement for Commerce's in choosing between two fairly conflicting views, even if it could "justifiably have made a different choice had the matter been before it de novo." *Goldlink Indus. Co. v. United States*, 431 F.Supp.2d 1323, 1326 (Ct. Int'l Trade 2006) (cleaned up).

Commerce has "broad discretion in executing" antidumping law, *Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983), and the Court affords "tremendous deference" to Commerce's administration of those laws, *id.* at 1582. The Federal Circuit has explained that,

> Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts. This deference is both greater than and distinct from that accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise in identifying, selecting and applying methodologies to implement the dictates set forth in the governing statute, as opposed to interpreting the meaning of the statue itself where ambiguous.

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (citations omitted).

## II.     Commerce's Decision to Accept Dongkuk's Reported Conversion Costs is Supported by Substantial Evidence and in Accordance with Law

### A.     Dongkuk Correctly Reported its Conversion Costs

Commerce's determination to accept Dongkuk's reported conversion costs is supported by substantial evidence and in accordance with law, and WTTC's contrary arguments are unavailing.

Dongkuk reported its conversion costs in accordance with 19 U.S.C. § 1677b(f)(1)(A). The statute imposes two conditions for the use of reported cost calculations:

> Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise.

19 U.S.C. § 1677b(f)(1)(A).

First, WTTC does not contest Commerce's finding that Dongkuk's records are kept in accordance with the exporting country's GAAP in accordance with 19 U.S.C. § 1677b(f)(1)(A). *See generally* WTTC Br.; IDM at 11. Thus, one half of the statutory criteria is undisputedly met.

Second, Commerce found that Dongkuk's reported conversion costs "reasonably reflect the costs associated with the production and sale of merchandise." IDM at 11 (citing 19 U.S.C. § 1677b(f)(1)(A); Dongkuk's IQR at D-13). As Commerce explained, Dongkuk's conversion costs are related to the physical characteristics of the merchandise because "they are reasonably consistent across wind towers that share the same number of sections{.}" IDM at 12; *see also* Final Analysis Memorandum (P.R. 119, C.R. 66-67) at Attachment 1. Commerce found that this product characteristic was the most important among all the product characteristics because "the remaining physical characteristics (i.e., paint, metal, busbar, power cable, lift, and internal physical characteristics) were almost identical." *Id.* at 12. Additionally, Commerce had already adjusted Dongkuk's plate costs that did not track with changes in physical characteristics. *Id.* at 11

WTTC nevertheless contends that Dongkuk's remaining reported conversion costs do not reasonably reflect costs associated with the production and sale of the merchandise because they vary in ways unrelated to the physical characteristics of its merchandise. WTTC Br. at 4 (Dongkuk reports "its conversion costs are 'akin to fixed costs that are not impacted by differences in product characteristics.'" (quoting Dongkuk's Pre-Preliminary Cmts at 2)). WTCC ignores two points in this regard.

First, it misapprehends Dongkuk's allocation of costs. In the very same sentence that WTTC quotes, Dongkuk explains "{t}hat {} unlike direct costs such as direct materials, *indirect costs* are akin to fixed costs that are not impacted by differences in product characteristics." Dongkuk's Pre-Preliminary Cmts. at 2 (emphasis added). These indirect costs represent around [    ] percent of all costs and were accurately recorded in Dongkuk's books. *Id.*; IDM at 11-12.

Second, this claim–that the whole of Dongkuk's conversion costs is not representative of production costs–rests on the erroneous presumption that, because Dongkuk allocated conversion costs according to monthly production quantities on a project-specific basis, they are not attributable to physical characteristics of the merchandise. WTTC Br. at 4-5. WTTC argues that "there is no basis for Commerce's conclusion that 'towers with the same number of sections would have similar production quantities {} and, therefore, similar conversion costs." *Id.* at 10 (citing IDM at 12).

WTTC misunderstands Commerce. Rather than entire CONNUMs having similar production quantities, Commerce explains, "{w}e find that comparing the per-unit conversion costs for CONNUMs that have the same number of sections per tower is appropriate because towers with the same number of sections should require a similar amount of time at each production process and, therefore, incur similar per-unit conversion costs." *Id.* Commerce

concluded that the other physical characteristics, such as "paint, metal, busbar, power cable, lift, and internal physical characteristics," between sections of different CONNUMs were largely the same.  *Id.*  Commerce then made that comparison, finding that wind towers with the same number of sections had reasonably consistent conversion costs, having absolute variance from the average conversion costs of only [          ] percent between CONNUMs with the same number of sections.  Final Analysis Memorandum at Attachment 1.[3]

Contrary to WTTC's argument, Commerce found that Dongkuk's reported conversion costs reasonably reflected the costs attributable to the physical characteristics of wind towers.  IDM at 12.  WTTC relies on *Wind Towers from Indonesia*, when Commerce adjusted conversion costs after concluding that there were deviations of more than 10 percent that were "solely influenced by production timing."  *Utility Scale Wind Towers from Indonesia: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 85 Fed. Reg. 40,231 (Dep't Commerce July 6, 2020), and accompanying Issues and Decision Memorandum at cmt. 5.  However, in this case, Commerce explicitly relied on Dongkuk's reported physical characteristics in its analysis because, "due to the project-specific nature of {Dongkuk's} cost accounting and reporting, it allocated its conversion costs based on the production quantities for each project during the month."  IDM at 11-12 (citing Dongkuk's IQR at D-13) ("ledgers can be linked directly to specific projects, and thus direct costs take up approximately **[    ]** percent of total production costs.  The costs that are not directly linked to projects are classified as indirect costs and first allocated to each production process . . . then subsequently allocated to each project.").  This explanation of Dongkuk's valid accounting

---

[3]  WTCC errs in arguing that Commence simply ignored other key characteristics like height and weight of the produced wind towers.  WTTC Br. at 10.  Those elements were accounted for in the adjustment of plate costs.  PDM at 9-10; IDM at 11, 13.

practices led Commerce to find that an analysis analyzing differences in conversion costs between wind towers with the same number of sections was "more appropriate than that performed in *Wind Towers from Indonesia* or by {WTTC} in this review." *Id.* at 12.  Commerce explained that "because Dongkuk's conversion costs are reasonably consistent across products with a similar number of sections, we do not find that Dongkuk's per-unit average conversion costs fluctuate in a way that is unrepresentative of the differences in physical characteristics." *Id* at 12; *see also* Final Analysis Memorandum at 3, Attachment 1.

Commerce also found that this case is not like *Wind Towers from Indonesia* because, in that case, the "total CONNUM-specific conversion costs per-MT {metric ton} deviated from the overall average by a significant percentage."  IDM at 11 (quoting *Wind Towers from Indonesia*, IDM at Comment 5).  Here, we have a deviation, at a maximum, of only [  ] percent.  Final Analysis Memorandum at 3, Attachment 1.

### B.    The Supposed Flaws WTTC Points to in Commerce's Analysis were Explained by Commerce

WTTC does not explicitly disagree with Commerce's finding that differences in the number of sections are responsible for variations in conversion costs across CONNUMs.  Rather, WTTC attempts to paint Commerce's analysis as "unreasonable" because of what WTTC sees as three flaws.  WTTC Br. at 8-9.  First, WTTC contends that Commerce "erroneously conflated conversion costs and plate costs as a basis to disregard . . . type, height, and weight," unlike WTTC's own analysis.  WTTC Br. at 7-9.  Second, WTTC contends that Commerce "unreasonably limited its analysis to only a portion of Dongkuk's CONNUMs." *Id.* at 10.  Lastly, WTTC argues "there is no basis for Commerce's conclusion that 'towers with the same number of sections would have a similar production quantities {sic} and, therefore, similar conversion costs." *Id.* at 10 (citing IDM at 12).  As discussed in section II.A, above, WTTC

misunderstands Commerce on this last point, which is further explained in the IDM. Below, we discuss the other two alleged flaws.

> **1.    Commerce Properly Chose to Analyze Whether Dongkuk's Per-Unit Conversion Costs Differed from The Average per-Unit Conversion Costs for CONNUMs with the Same Number of Sections**

WTTC contends that Commerce "illogically conflates plate costs with conversion costs" when Commerce "disregard{ed} the three most important physical characteristics—type, height, and weight." WTTC Br. at 9. To be clear, Commerce found that it was most appropriate to analyze the first three physical characteristics of type, height, and weight, in the context of direct material costs. IDM at 11-12; *see also* Dongkuk's Pre-Prelim. Cmts. at 6. That was because "the plate costs increase as the number of plates used increases, and the number of plates used per tower increase as the weight and height of the tower increases." Dongkuk's SDQR at SD-3 (C.R. 28) (August 8, 2024); *see also* Dongkuk's SDQR at SD-4 ("Because DKSC reported costs on a per-piece basis, a direct correlation also exists between the number of sections and the reported cost differences.").

That is consistent with Commerce's findings in the prior administrative review. *See Prior Review Results* IDM at 7 ("Commerce then analyzed the steel plate input costs for the different CONNUMs because it is the primary input that affects the weight and height physical characteristics of the wind tower"). As such, in this case, Commerce adjusted, as WTTC requested, "the steel plate costs for all reported CONNUMs to mitigate the steel plate costs differences unrelated to the physical characteristics of the products." IDM at 11; *see* Preliminary Calculation Memorandum (C.R. 50), at 1-2 and Attachment 5 ("differences in steel plate costs between CONNUMs do not appear to be related to differences in the physical characteristics of the products."); IDM at 13 ("{w}ith regard to the petitioner's arguments about height and

weight, as discussed below, we have already analyzed how the type, height, and weight of each tower impacts the steel plate costs for the tower.").

Because of this difference in steel plate costs amongst CONNUMs, Commerce "mitigate{d} reasonable cost differences unrelated to the product physical characteristics, we weight averaged the reported plate costs for all reported CONNUMs."  Preliminary Calculation Memorandum at 1-2; *see also* PDM at 10 ("We weight averaged the steel plate input costs for all reported control numbers to mitigate the material costs difference unrelated to the physical characteristics of the products.").[4]

Commerce then found that remaining differences in conversion costs are explained by differences in the remaining product characteristics including sections–the fourth most important product characteristic.  IDM at 12.  Because Commerce found substantial similarities among most of the remaining product characteristics, except for the number of sections per CONNUM, Commerce found it appropriate to instead analyze Dongkuk's allocation of its conversion costs by analyzing how conversion costs change for products with an identical number of sections.  *Id.* at 12.  Commerce justifies that approach by explaining that "towers with the same number of

---

[4] Commerce's approach in this case is not without precedent.  *See Certain Hot-Rolled Steel Flat Products From the Republic of Korea; 2017-2018,* 84 Fed. Reg. 68,407 (Dep't Commerce Dec., 16, 2019), and accompanying Preliminary Decision memorandum ("In accordance with {19 U.S.C. § 1677b(b)(3)}, we calculated cost of production (COP) based on the sum of costs of materials and fabrication for the foreign like product, plus amounts for general and administrative expenses (G&A) and interest expenses. We made certain adjustments to mitigate the direct material cost differences that are unrelated to physical characteristics. However, we relied on all other COP data submitted by Hyundai, as reported in its most recently submitted cost databases for the COP calculation"); *Certain Hot-rolled Steel Flat Products From the Republic of Korea; 2017-2018,* 86 Fed. Reg. 10,040 (Dep't Commerce Feb. 18, 2021), and accompanying Preliminary Decision memorandum; *Certain Uncoated Paper from Indonesia*, 80 Fed. Reg. 51,771 (Dep't Commerce Aug. 26, 2015), and accompanying Preliminary Decision memorandum.

sections should require a similar amount of time at each production process and, therefore, incur similar per-unit conversion costs." *Id.*

Commerce did not "illogically conflate" steel plate and conversion costs.

### 2. Commerce did not Unreasonably Limit its Analysis to a Portion of Dongkuk's CONNUMs

WTTC further contends that Commerce "unreasonably limited its analysis to only a portion of Dongkuk's CONNUMs." WTTC Br. at 10. But Commerce did not "limit" its analysis; rather, Commerce compared all CONNUMs that shared the same number of sections. Final Calculation Memorandum at Attachment 1. Because of the nature of the dataset, some CONNUMs [                                                            ]. *Id.* Additionally, WTTC cherry-picks the data to assert that a large disparity exists between physical characteristics and conversion costs by stating that CONNUMs with [

    ] "includes the CONNUM accounting for the [              ] number of sections produced." WTTC Br. at 10. Those [      ] CONNUMs that had [                              ] represented the [          ] produced CONNUM at [    ] towers and the [          ] produced CONNUMs at [      ] tower with [      ] sections and [                        ]. Final Calculation Memorandum at Attachment 1. In all, despite inherent limitations of the dataset with respect to the number of sections per CONNUM, Commerce was able to test [      ] percent of the total number of sections produced during the POR and properly found, based on the record, that Dongkuk's conversion costs are reasonably consistent across products with a similar number of sections. *Id.*; *see also* IDM at 12. Commerce did this "agree{ing} with the petitioner that [

                                        ] the number of sections per tower." Final Calculation Memorandum at 3.

WTTC's analysis fatally ignores all but one CONNUM characteristic and ignores the unique nature of these towers. To perform its conversion costs analysis, Commerce took a reasonable approach in comparing towers with the same number of overall sections. Final Calculation Memorandum at Attachment 1.

As such, Commerce's decision not to adjust Dongkuk's reported conversion costs any more than had been done in the PDM is supported by substantial evidence.

### C.    Commerce did not Depart from its Standard Practice when it Refrained from Adjusting Dongkuk's Reported Conversion Costs

As described by the Court in *BlueScope Steel, Ltd. v. United States*, to establish that an agency unlawfully departed from established practice, a party must show that (1) an established practice exists, (2) there was a departure from that practice, and (3) the departure was insufficiently explained. 719 F.Supp.3d 1357, 1367 (Ct. Int'l Trade 2024) (citations omitted). WTTC has failed to establish that a practice exists, that Commerce departed from that practice, or that Commerce insufficiently explained any alleged departure.

WTTC argues that "Commerce erred when it failed to adjust conversion costs that differed among products in ways that were not tied to the physical characteristics of Dongkuk's merchandise." WTTC Br. at 3. As Commerce explains, WTTC's assertion of no relation between conversion costs and physical characteristics of the merchandise "ignores certain record evidence. {. . .} {Dongkuk's} indirect costs are 'first allocated to each production process. . . and then subsequently allocated to each project based on the production quantity.'" IDM at 11 (quoting Dongkuk's IQR at D-13). Dongkuk's IQR further explains,

> {Dongkuk} maintains costs on *a project-specific basis* in the normal course of business. And {Dongkuk} classifies the costs into *direct costs and indirect costs*. Mostly, payment ledgers can be linked directly to specific projects, and thus direct costs take up *approximately [    ] percent* of total production costs. The costs

> that are not directly linked to projects are classified as indirect
> costs and first allocated to each production process based on the
> allocation basis set by the nature of the accounts and then
> subsequently allocated to each project based on the production
> quantity.  For example, {Dongkuk} classifies the employee labor
> costs for the company as indirect costs, and then allocates the same
> amounts to each production process.  The allocated labor costs for
> each process are assigned to production quantity of each project
> that passes through the process.

(P.R. 36, C.R. 11) (emphasis added).

WTTC cites two administrative proceedings to assert that Commerce's has an alleged

practice that Commerce allegedly disregarded:  *Wind Towers from Indonesia* and *Common Alloy*

*Aluminum Sheet from Italy: Final Affirmative Determination of Sales at Less than Fair Value*

*(LTFV)*, 86 Fed. Reg. 13,309 (Dep't Commerce Mar. 8, 2021).  *Id.* at 4.  As Commerce directly

explains regarding *Wind Towers from Indonesia*, "{Commerce} found it was appropriate to

smooth the respondent's conversion costs . . . because {Commerce} 'observed that for a

significant portion of total production, the total CONNUM-specific conversion costs per-{metric

ton} deviated from the overall average by a significant percentage.'"  IDM at 11 (quoting *Wind*

*Towers from Indonesia* IDM at cmt. 5).  In this case, because Commerce was "able to account for

the cost differences that should arise from the different number of sections per wind tower,

{Commerce found} that {the analysis performed in this case} is more appropriate than that

performed in *Wind Towers from Indonesia*{.}"  *Id.* at 12.  Additionally, as the Court previously

explained when considering the prior review, the few administrative cases cited by WTTC are

not sufficient to establish a past practice:

> Fatally, Plaintiff makes no showing of its alleged practice. In its
> reply, Plaintiff raises three additional examples of Commerce
> adjusting conversion costs (per-unit direct labor, variable overhead,
> and fixed overhead) due to differences in production time or
> quantities, where the costs did not correspond to physical
> characteristics.  These additional examples are unpersuasive,

> however, as prior determination by the agency with regard to one
> industry typically provide little guidance for later determinations
> with regard to different industries.  Commerce has previously used
> the conversion cost calculation at issue in other administrative
> determinations, as well as the underlying investigation, the Section
> 751 review, and now the second review.  Further, Commerce
> reasonably explained that the facts of this case are distinguishable
> from *Wind Towers from Indonesia*{.} . . ..  Therefore, Plaintiff has
> failed to demonstrate that *Wind Towers from Indonesia* constituted
> an established practice from which Commerce departed.

*Wind Tower Trade Coalition*, 2025 WL 3461684, at *5 (internal citations omitted).

WTTC has not provided sufficient support to show that *Wind Towers from Indonesia*

established a practice from which Commerce departed.  Commerce thoroughly explains how this

case is different from *Wind Towers from Indonesia* and why Commerce chose to take a different

approach for a unique industry, and further, the product at issue is not aluminum alloy sheets.

*See* IDM at 11-12.  As such, Commerce did not unlawfully depart from a standard practice, and

its decision not to adjust Dongkuk's reported conversion costs is in accordance with law.

## III.    Commerce's Decision to Rely on Dongkuk's CV Profit Ratio from the Previous Review is Supported by Substantial Evidence and in Accordance with Law

When no above-cost sales of the foreign like product in the comparison market are

available to determine whether U.S. sales were at less than fair value, Commerce will use one of

three alternatives outlined in 19 U.S.C. § 1677b(e)(2)(B)(i)-(iii) to establish CV.  IDM at 3-4.

These alternatives are

> (i) the actual amounts incurred and realized by the specific
> exporter or producer being examined in the investigation or review
> for selling, general, and administrative expenses, and for profits, in
> connection with the production and sale, for consumption in the
> foreign country, of merchandise that is in the same general
> category of products as the subject merchandise,
> (ii) the weighted average of the actual amounts incurred and
> realized by exporters or producers that are subject to the
> investigation or review (other than the exporter or producer
> described in clause (i)) for selling, general, and administrative

expenses, and for profits, in connection with the production and
sale of a foreign like product, in the ordinary course of trade, for
consumption in the foreign country, or
(iii) the amounts incurred and realized for selling, general, and
administrative expenses, and for profits, based on any other
reasonable method, except that the amount allowed for profit may
not exceed the amount normally realized by exporters or producers
(other than the exporter or producer described in clause (i)) in
connection with the sale, for consumption in the foreign country, of
merchandise that is in the same general category of products as the
subject merchandise{.}

19 U.S.C. § 1677b(e)(2)(B)(i)-(iii).  Among these alternatives, the statute does not establish a

preference .  19 U.S.C. § 1677b(e)(2)(B); *see also* SAA at 840 ("At the outset, it should be

emphasized, consistent with the antidumping agreement, new section {1677b(e)(2)(B)} does not

establish a hierarchy or preference among these alternative methods.  Further, no one approach is

necessarily appropriate for use in all cases").  As the SAA further explains, "the selection of an

alternative will be made on a case-by-case basis and will depend, to an extent, on available date."

SAA at 840; *see also* IDM at 4.

Uncontested in this case is that there were no above cost sales in the comparison market,

nor any other respondents under review,  Thus, the only alternative available to Commerce was

option (iii), allowing Commerce to use "any other reasonable method, except that the amount

allowed for profit may not exceed the amount realized by exporters or producers . . . in

connection with the sale, for consumption in the foreign country, of merchandise that is in the

same general category of products as the subject merchandise."  19 U.S.C. § 1677b(e)(2)(B)(iii).

In selecting between the available alternative data sources, Commerce follows its practice

in considering four criteria for choosing among surrogate data options:  (1) the similarity of the

potential surrogate companies' business operations and products to the respondents'; (2) the

extent to which the financial data of the surrogate company reflect sales in the home market and

do not reflect sales in the United States; (3) the contemporaneity of the data; and (4) the extent to

which the customer base of the surrogate company and the respondent are similar.  IDM at 5.

Commerce found that Dongkuk's own data from the prior review constituted the best available

information on the record because, although less contemporaneous to the majority of the

alternative data sources, the specificity of Dongkuk's data under all three of the other factors

outweighed its contemporaneity in regard to both product and the country of production.  *Id.* at 6.

Additionally, Commerce had relied on that data in the prior administrative review.  *Id.* (citing

*Prior Review Preliminary Results* PDM at 11).  Thus, Commerce selected the best information

that reflected the home market experience of Dongkuk.  *See Mid Continent Steel & Wire, Inc. v.

United States*, 941 F.3d 530, 542 (Fed. Cir. 2019) ("The goal in calculating {constructed value}

profit is to approximate the home market profit experience of the respondents." (internal

quotation marks and citation omitted).

WTTC contends that Commerce departed from established practice when Commerce

selected Dongkuk's CV selling and profit data from the prior review because Commerce's

practice is to reject a company's financial information as a source for CV profit data if that

company is unprofitable.  WTTC Br. at 14-15; *see also* WTTC Case Br. at 1.  As described

above, WTTC must show that (1) there was an established practice, (2) that Commerce departed

from that practice, and (3) Commerce failed to sufficiently explain its departure from that

practice.  *BlueScope Steel*, 719 F.Supp.3d at 1367.

Regarding this alleged practice, Commerce in its *Final Results* explains,

> we disagree with {WTTC} that the U.S. Court of International
> Trade's statement that '{t}he objective is to find a good proxy (or
> surrogate) for profits that the respondent can fairly be expected to
> build into a fair sales price of the particular merchandise' means
> that the statute requires that Commerce disregard a source for CV

profit when the company was not profitable at the company-wide
level.

IDM at 6 (citing WTTC Case Br. at 6-8 (citing *Hyundai Steel Company v. United States*, 675 F.

Supp. 3d 1307, 1308 (CIT 2023); *SeAH Steel Corp. v. United State*s, 513 F. Supp. 3d 1367, 1396

(CIT 2021))). Rather, "it is Commerce's '*preference* . . . to use the financial statements of

companies that have earned a profit.'" *Id.* (citing *Certain Fish fillets from the Socialist Republic

of Vietnam: Final Results of the Antidumping Duty Administrative Review and New Shipper

Reviews*, 74 Fed. Reg. 11,349 (Dep't Commerce Mar. 17, 2009) and accompanying IDM at cmt.

1 (emphasis added)).

WTTC cites several cases when Commerce applied this preference. *See* WTTC Br. at 14-

15. Some of these cases show that Commerce will "evaluate{} a source's profitability on a more

specific basis than the company-wide level if such information is on the record." IDM at 6

(citing *Utility Scale Wind Towers from Malaysia: Preliminary Determination of Sales at Not Less

Than Fair Value and Postponement of Final Determination*, 86 Fed. Reg. 27,828 (Dep't

Commerce May 24, 2021) and accompanying PDM at 12, unchanged in *Utility Scale Wind

Towers from Malaysia: Final Affirmative Determination of Sales at Less Than Fair Value*, 86

Fed. Reg. 56,894 (Dep't Commerce Oct. 13, 2024); and *Biodiesel from Indonesia: Final

Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 8,835 (March 1, 2018) and

accompanying IDM at 34). In both *Wind Towers from Malaysia* and *Biodiesel from Indonesia*,

Commerce rejected sources of SV profit when the company as a whole was profitable because

segments of the company related to comparable merchandise were not profitable. IDM at 6-7

(citing *Wind Towers from Malaysia* PDM at 12; *Biodiesel from Indonesia* IDM at 34).

In this case, Commerce had granular CV profit data from the prior review allowing

Commerce to analyze Dongkuk's above-cost sales of wind towers on which it earned a profit,

even though the company as a whole operated at a loss.  IDM at 7.  As Commerce describes in its

Final Analysis Memorandum,

> {W}e note that Dongkuk had a viable home market in the prior
> review.  Therefore, there is no reason to disregard Dongkuk's CV
> selling and profit ratios based on the volume of its home market
> sales.  Moreover, Commerce determined that it was appropriate to
> rely on Dongkuk's [                                        ] to
> calculate CV and determine Dongkuk's margin in the prior review.
> Consequently, we find that it is reasonable to rely on the CV profit
> and selling expense ratios calculated using Dongkuk's data in the
> prior review to calculate a dumping margin in the current review.

Final Analysis Memorandum at 2 (citing *Utility Scale Wind Towers From the Republic of Korea:*

*Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination*

*of No Shipments; 2021-2022*, 88 Fed. Reg. 60,929 (Dep't Commerce, Sep. 6, 2023) (*Prior*

*Review Preliminary Results*) and accompanying PDM at 7 ("we determined that, pursuant to

19 C.F.R. § 351.404(b), the aggregate volume of Dongkuk's home market sales of the foreign

like product was sufficient to permit a proper comparison with U.S. sales of the merchandize.

Therefore, we used home market sales as the basis for NV, in accordance with {19 U.S.C.

§ 1677b(a)(1)(B)(ii)}"), unchanged in *Prior Review Results*).  Commerce thus found that the best

information to evaluate the home market experience of Dongkuk was its own home market data.

Commerce additionally explains that none of the other CV profit data sources on the

record were more appropriate than Dongkuk's data.  IDM at 7.  For example, although WTTC

has not identified for the Court a source of CV profit and selling expense information on the

record that WTTC prefers, *see* WTTC Br. *generally*, in its case brief before Commerce WTTC

argued that Commerce "should instead derive CV profit and selling expenses from the financial

statements of Husteel Co. Ltd. (Korea) ('Husteel') or SeAH Steel Holdings Corporation

('SeAH'){.}"  WTTC Case Br. at 10.  However, as Commerce explains, both companies'

financial statements demonstrated that they primarily produce and sell steel pipe–not wind towers.  IDM at 8.  Having "CV selling expense and profit ratios calculated from {Dongkuk's} own sales of the foreign like product in the prior review{,}" Commerce found preferable to use data relating to the merchandise under consideration.  *Id.* at 8-9.  Commerce was aware of WTTC's argument as the limited nature of the profitable sales of Dongkuk, IDM at 2, however, Commerce looked to the full extent of the record to determine that Dongkuk's data were still the best in the record compared to WTTC's proposed alternatives.  WTTC Br. at 17; *see also* Dongkuk Final Analysis Memorandum at 2.

Specifically, Commerce observed that "there is no reason to disregard Dongkuk's CV selling and profit ratios based on the *volume* of its home market sales."  Final Calculation Memorandum at 2.[5]  In doing so, Commerce relies on the Federal Circuit opinion in *Mid Continent Steel & Wire, Inc,* 941 F.3d at 538.  The appellant in that case contended that the "volume of identified sales and transactions was too insignificant."  *Id.*  The Federal Circuit rejected this argument explaining that "the statutory language {at 19 U.S.C. § 1677b(2)(A)} allows Commerce to consider whether the information suffices for use in making accurate calculations—which may well depend on the volume of home-country sales and how that volume affects the reliability of the information used for Commerce's accomplishment of its assigned task."  *Id.* at 539; *see also Unicatch Indus. Co., Ltd. v. United States*, 539 F. Supp. 3d 1229, 1242 (Ct. Intl. Trade 2021) ("{plaintiff} does not challenge Commerce's determination that 'actual data' were 'available' on sales in the 'ordinary course of trade' for purposes of its

---

[5]  WTTC makes much of Dongkuk's [     ] sale to base its CV profit ratio on, but WTTC fails to recognize that this is really [     ] sale out of [     ] to the home market and thus represents [     ] percent overall profit in home sales.  CV Profit Cmts, at Attachment 1 at 21 (C.R. 39) (Aug. 23, 2024).

calculation of CV profit and, therefore, {plaintiff's} challenge fails."}.  With Commerce's statutory discretion and Commerce's rigorous analysis of all other options on the record, Commerce's conclusion is supported by substantial evidence.

Commerce explains that "SeAH receives substantial government subsidies, rendering its financial statements less accurate as a source for CV profit and selling expenses." *Id.* at 9. Commerce therefore found that neither company's financial statement was a more appropriate source for CV selling expense and profit data than Dongkuk's data from the prior review. *Id.* at 9.  Commerce made a similar determination with a full explanation of Commerce's rationale for each potential source of CV selling expense and profit data on the record. *Id.* at 7-10; Final Analysis Memorandum at 2-3.

As such, Commerce did not unlawfully depart from established practice when Commerce used Dongkuk's CV selling and profit data from the prior administrative review.   Commerce rationally navigated its ways through the alternative sources of data.  Although WTTC, "raises {} factual arguments in opposition, but neither establishes that Commerce's conclusion was unreasonable." *Best Mattresses Intl. Co. Ltd. v. United States*, 622 F. Supp. 3d 1347, 1391 (Ct. Intl. Trade 2023).  Commerce's decision to use Dongkuk's CV selling and profit data is supported by substantial evidence and in accordance with law.

## CONCLUSION

For these reasons, we respectfully request that the Court deny WTTC's motion, sustain Commerce's *Final Results*, and enter judgement for the United States.

**PUBLIC VERSION**

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                          /s/ Tate N. Walker
KARL MUELLER                         TATE NATHAN WALKER
Attorney                             Trial Attorney
Department of Commerce               Commercial Litigation Branch
Office of Chief Counsel for Trade    U.S. Department of Justice
Enforcement & Compliance             Civil Division
1401 Constitution Avenue, NW         P.O. Box 480
Washington, DC 20230                 Ben Franklin Station
                                     Washington, D.C., 20044
                                     Tel: (202) 307-0163
                                     Email: Tate.Walker@usdoj.gov

February 9, 2026                     *Attorneys for Defendant*

**PUBLIC VERSION**

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this post-hearing brief complies with the word limitations set forth in the Court's Chambers Procedures. Specifically, excluding those exempted portions as set forth in paragraph 2(B)(1) of the Chambers Procedures, I hereby certify that this brief contains 9,750 words. This word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Tate N. Walker
TATE N. WALKER