NON-CONFIDENTIAL VERSION

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| WIND TOWER TRADE COALITION<br><br>　　　　　　　　Plaintiff,<br>　v.<br><br>UNITED STATES,<br><br>　　　　　　　　Defendant,<br><br>　　and<br><br>DONGKUK S&C CO., LTD.,<br><br>　　　　　　Defendant-Intervenor. | Before: Hon. Leo M. Gordon,<br>　　　　　Senior Judge<br><br>Court No. 25-00104<br><br>**<u>NON-CONFIDENTIAL<br>VERSION</u>**<br><br>Business Proprietary Information<br>Removed from Pages: 3-5, 8-10, 12-15 |

### <u>PLAINTIFF WIND TOWER TRADE COALITION'S REPLY BRIEF</u>

Robert E. DeFrancesco, III, Esq.
Maureen E. Thorson, Esq.
Laura El-Sabaawi, Esq.
John Allen Riggins, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Wind Tower Trade Coalition*

Dated: April 6, 2026

**Court No. 25-00104**                                    NON-CONFIDENTIAL VERSION


## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................ 1

II.    ARGUMENT.............................................................................................................. 1

    A.    Commerce Erred by Relying on Reported Costs that Do Not Reflect the Physical Characteristics of Dongkuk's Merchandise ............................................................ 1

        1.    Dongkuk's Reported Conversion Costs Are Not Tied to the Physical Characteristics of Its Merchandise .............................................................. 4

        2.    Commerce Draws Unreasonable Conclusions from a Flawed Analysis to Justify Relying on Dongkuk's Unadjusted Conversion Costs .................... 7

    B.    Commerce Erred by Using Unprofitable Financial Information from the Previous Review as the Basis for Constructed Value ....................................................... 10

III.    CONCLUSION....................................................................................................... 16

Court No. 25-00104                                    NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dongkuk S&C Co. v. United States,*
    134 F.4th 1320 (Fed. Cir. 2025) ......................................................................................7

*Mid Continent Steel & Wire, Inc. v. United States,*
    941 F.3d 530 (Fed. Cir. 2019).........................................................................................11

*SKF USA Inc. v. United States,*
    263 F.3d 1369 (Fed. Cir. 2001).......................................................................................11

*Thai Plastic Bags Indus. Co. v. United States,*
    746 F.3d 1358 (Fed. Circ. 2014).......................................................................................2

*Wind Tower Trade Coalition v. United States,*
    810 F. Supp. 3d 1351 (Ct. Int'l Trade 2025) ................................................................4, 8

**Statutes**

19 U.S.C. § 1677b(a)(4).........................................................................................................10

19 U.S.C. § 1677b(f)(1)(A)................................................................................................2, 4, 5

**Administrative Materials**

*Antidumping Duties; Countervailing Duties,*
    61 Fed. Reg. 7,308, 7,339 (Dep't of Commerce Feb. 27, 1996) ......................................2

Issues and Decision Memorandum for the Final Affirmative Determination in the
    Antidumping Duty Investigation of Biodiesel from Indonesia
    (Dep't of Commerce Feb. 20, 2018).............................................................................13, 14

Issues and Decision Memorandum for the Final Affirmative Determination in the
    Less-Than-Fair-Value Investigation of Common Alloy Aluminum Sheet from
    Italy (Dep't of Commerce Mar. 1, 2021)........................................................................2, 15

Issues and Decision Memorandum for the Final Affirmative Determination of
    Sales at Less-Than-Fair-Value of Frozen Warmwater Shrimp from Indonesia
    (Dep't of Commerce Oct. 21, 2024) ............................................................................11, 12

Issues and Decision Memorandum for the Final Results of the 2018-2019
    Administrative Review of the Antidumping Duty Order on Certain Steel Nails
    from the Sultanate of Oman (Dep't of Commerce Feb. 24, 2021) ......................................16

**Court No. 25-00104**                                   NON-CONFIDENTIAL VERSION

Issues and Decision Memorandum for the Final Results of the 2022-2023
    Administrative Review of the Antidumping Duty Order on Utility Scale Wind
    Towers from the Republic of Korea (Dep't of Commerce May 2, 2025) ...................... *passim*

Issues and Decision Memorandum for the Less-Than-Fair-Value Investigation of
    Electrolytic Manganese Dioxide from Australia
    (Dep't of Commerce Aug. 14, 2008)....................................................................11

Issues and Decision Memorandum for the Notice of Final Determination of Sales
    at Less Than Fair Value: Polyvinyl Alcohol from the Republic of Korea
    (Dep't of Commerce Aug. 11, 2003) ....................................................................11

Issues and Decision Memorandum for the Preliminary Determination in the Less-
    Than-Fair-Value Investigation of Utility Scale Wind Towers from Malaysia
    (Dep't of Commerce May 18, 2021)....................................................................12

*Utility Scale Wind Towers From the Republic of Korea*,
    90 Fed. Reg. 19,672 (Dep't of Commerce May 9, 2025) ....................................1, 7

**Court No. 25-00104**                                              NON-CONFIDENTIAL VERSION

## I.    INTRODUCTION

On behalf of Plaintiff Wind Tower Trade Coalition ("Plaintiff" or "WTTC"), we respectfully submit this brief in reply to the responses filed by Defendant the United States ("Defendant") and Defendant-Intervenor Dongkuk S&C Co., Ltd. ("Dongkuk" or "Defendant-Intervenor"). *See* Defendant's Resp. in Opp'n to Pl.'s Mot. For J. on the Agency R. (Feb. 9, 2026), ECF Nos. 27-28 ("Defendant Br."); Resp. of Dongkuk S&C Co., Ltd. in Opp'n to Pl.'s Rule 56.2 Mot. For J. on the Agency R. (Mar. 9, 2026), ECF Nos. 29-30 ("Defendant-Intervenor Br.").

## II.    ARGUMENT

This appeal arises from the U.S. Department of Commerce's ("Commerce") 2022-2023 administrative review of the antidumping duty order on utility scale wind towers from Korea. *See Utility Scale Wind Towers From the Republic of Korea*, 90 Fed. Reg. 19,672 (Dep't of Commerce May 9, 2025) ("Final Results"); Issues and Decision Memorandum for the Final Results of the 2022-2023 Administrative Review of the Antidumping Duty Order on Utility Scale Wind Towers from the Republic of Korea (Dep't of Commerce May 2, 2025), available at https://access.trade.gov/public/FRNoticesListLayout.aspx at barcode 4756024-02 (last visited Mar. 30, 2026) ("Final Decision Memorandum"). WTTC has appealed Commerce's (1) use of Dongkuk's unadjusted conversion costs and (2) reliance on certain financial information from the previous review as the basis for constructed value ("CV"). WTTC seeks a remand to correct these errors.

### A.    Commerce Erred by Relying on Reported Costs that Do Not Reflect the Physical Characteristics of Dongkuk's Merchandise

As part of the review process, the mandatory respondent companies submit information regarding their sales and costs to permit Commerce to calculate a dumping margin specific to each

1

company. However, the Tariff Act of 1930 ("the Act") does not permit Commerce to accept a respondent's cost reporting without scrutiny. Rather, Commerce may only rely on the costs reported in a respondent's books and records "if such records . . . reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A).

Commerce's longstanding position is that the costs associated with the production and sale of subject merchandise are those attributable to differences in the physical characteristics of the merchandise. This approach recognizes that physical differences "'generally account' for major differences in costs." *Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1368 (Fed. Circ. 2014) (quoting *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,339 (Dep't of Commerce Feb. 27, 1996)). Commerce will adjust the respondent's reported costs where they reflect conditions other than the physical differences between products, such as production timing, volumes of production, or the relative efficiencies of distinct production processes. *See, e.g.*, Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Common Alloy Aluminum Sheet from Italy (Dep't of Commerce Mar. 1, 2021), available at https://access.trade.gov/Resources/frn/summary/italy/2021-04739-1.pdf at barcode 4093353-02 (last visited Mar. 30, 2026) at 34.

In its opening brief, the WTTC explained that Commerce's reliance on Dongkuk's unadjusted conversion costs was unexplained and not supported by substantial evidence. Dongkuk conceded below that its conversion costs are "akin to fixed costs that are not impacted by differences in product characteristics." Dongkuk's Response to Pre-Preliminary Cmts., CD 43, PD 73 at 2 (Aug. 26, 2024) ("Dongkuk Pre-Prelim Resp."). Moreover, Dongkuk acknowledged that it allocates conversion costs on a monthly basis depending on the amount of production activity that occurred (*i.e.*, not based on the physical characteristics of the towers produced). *See id.*

2

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

**Court No. 25-00104**                                                           NON-CONFIDENTIAL VERSION

These admissions alone are sufficient to establish that Dongkuk's reported conversion costs reflect conditions other than the physical characteristics of the wind towers it makes. However, Petitioner also provided an analysis of Dongkuk's conversion costs—using a uniform cost-per-section comparison—that illustrated how significantly they varied without regard to physical characteristics. *See* Pl.'s Mot. For J. on the Agency R. (Nov. 10, 2025), ECF Nos. 23-24, at 7-8 ("Plaintiff Br.") (citing WTTC Pre Prelim Cmts., CD 36-37, PD 59, at Exhibit 1 (Aug. 15, 2025)). Specifically, this analysis demonstrated that [    ] of [    ] tower sections—or [      ]%—had conversion costs that deviated significantly from the overall per-section conversion costs. *See id.* The structure of this analysis was taken from Commerce's previous conversion cost smoothing analysis in *Utility Scale Wind Towers from Indonesia* and permitted Commerce to compare conversion costs for specific wind tower models based on all CONNUM characteristics. *See id.* at 5 n.2.

Commerce's final results ignored Dongkuk's admissions and Plaintiff's analysis. Instead, Commerce found that Dongkuk's project-specific monthly conversion cost allocations supported the relationship between reported costs and the physical characteristics of Dongkuk's merchandise. Making matters worse, Commerce limited its analysis to a comparison of conversion costs among towers with the same number of sections, ignoring the most important physical characteristics (*i.e.*, type, weight, and height). Final Decision Memorandum at 11-12; *see also* Final DOC Analysis Memorandum CD 66-67, PD 119, at Attachment 1 (May 2, 2025) ("Final DOC Analysis"). In their responsive briefing, Defendant and Defendant-Intervenor doubled down on these errors.

3

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

**Court No. 25-00104**                                                  NON-CONFIDENTIAL VERSION

### 1. Dongkuk's Reported Conversion Costs Are Not Tied to the Physical Characteristics of Its Merchandise

Defendant and the Defendant-Intervenor rely heavily on the circular logic that Dongkuk's reported costs are appropriate because they were reflect the costs recorded in the company's books and records. *See* Defendant Br. at 18 ("These indirect costs represented around [   ] percent of all costs and were accurately recorded in Dongkuk's books.") (citing Dongkuk's Pre-Prelim Resp. at 2); Defendant-Intervenor Br. at 6 ("DSKC used actual manufacturing costs from its accounting system to calculate the per-unit direct labor, variable overhead, and fixed overhead reported for each project.").

The court, however, has previously rejected this is same reasoning as a basis for relying on Dongkuk's unadjusted conversion costs. *See Wind Tower Trade Coalition v. United States*, 810 F. Supp. 3d 1351, 1358 (Ct. Int'l Trade 2025) ("Commerce failed to explain why Dongkuk's reported conversion costs were appropriate, save for circular reasoning that 'Dongkuk reported its conversion costs based on its normal books and records.'"). And regardless, Commerce's treatment of Dongkuk's costs must be statutorily sound. Section 1677b(f)(1)(A) of the Act does not allow Commerce to assume that a respondent's reported costs accurately reflect the costs of producing subject merchandise. Rather, Commerce must examine those costs and ensure they reasonably reflect the cost of producing the subject merchandise, an analysis that it has traditionally rooted in an assessment of cost differences between products with different physical characteristics. Commerce's superficial reasoning is inconsistent with its statutory obligation and past practice.

Relatedly, Defendant defends Commerce by reference to Dongkuk's "valid accounting practices." *See* Defendant Br. at 19-20. This approach conflates the two separate requirements of 19 U.S.C. § 1677b(f)(1)(A)—*i.e.*, that a respondent's records are "kept in accordance with the

4

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

**Court No. 25-00104**                                                    NON-CONFIDENTIAL VERSION

generally accepted accounting principle of the exporting country" and "reasonably reflect the costs associated with the production and sale of the merchandise." *See* 19 U.S.C. § 1677b(f)(1)(A). Defendant assumes that Dongkuk's reported costs reflect the production of subject merchandise *because* they are kept in accordance with "valid accounting practices." But compliance with the second statutory requirement does not necessarily flow from the first. Rather, the statute's separate requirements presuppose the existence of situations—like the one here—where recorded costs are based on valid accounting practices but, nevertheless, do not reasonably reflect the costs associated with the production and sale of subject merchandise.

Similarly, Defendant and Defendant-Intervenor shelter behind the "project-specific" nature of Dongkuk's costs. *See* Defendant Br. at 19; Defendant-Intervenor Br. at 6. Both parties assume that costs reported on a project-specific basis are necessarily tied to the physical characteristics of the merchandise. *See, e.g.*, Defendant-Intervenor Br. at 6 ("{Dongkuk's} reported conversion costs are directly related to the differences in the merchandise's physical characteristics. {Dongkuk} used actual manufacturing costs from its accounting system to calculate conversion ratios and applied such ratios over monthly production quantities for each project."). But the record shows that Dongkuk's conversion costs are assigned to specific projects based on monthly production volumes. *See* Dongkuk Pre-Prelim Resp. at 2. Indeed, Dongkuk reported per-unit conversion costs that [                                                    ]—even where Dongkuk produced [                                            ] month. *See* Dongkuk Section D Supplemental Questionnaire Response, CD 24-35, PD 53-55 at Exhibit SD-32 (Aug. 7, 2024) ("Dongkuk Supp. D"). The data thus shows that reported conversion costs depend on how many sections Dongkuk produces in a month, rather than the types of towers associated with a given project. And as discussed, Plaintiff's analysis

5

further demonstrated that Dongkuk's conversion costs are untethered from the physical characteristics of its towers. *See* WTTC Pre-Prelim Cmts. at Exhibit 1.[1]

Moreover, Commerce's treatment of plate costs in this review demonstrates that project-specific costs are not automatically tied to the physical characteristics of the merchandise. With regard to plate costs, Dongkuk explained that "{m}ost raw material and other material costs incurred are directly traceable to individual projects . . . ." Dongkuk Supp. D at SD-10. Nevertheless, Commerce found that Dongkuk's reported plate costs reflected the timing of the steel plate's purchase, not the physical characteristics of Dongkuk's output merchandise. Final Decision Memorandum at 11-12. Thus, even though Dongkuk's steel plate costs were directly traceable to specific projects, they were not tied to the physical characteristics of Dongkuk's towers. *Id.* It is unreasonable for the Department now to conclude as a matter of course that project-specific costs are necessarily related to the physical characteristics of Dongkuk's merchandise.

Finally, Dongkuk's monthly weight-based allocation is not, as Defendant-Intervenor suggests, evidence that Dongkuk's costs are based on the physical characteristics of the merchandise. *See* Defendant-Intervenor Br. at 6-7. Specifically, Dongkuk claims that its conversion costs are "inherently . . . tied to what was produced and how much was produced because projects with more sections—and therefore reflecting a greater quantity (weight) produced—may absorb more conversion costs." *Id.* However, these conversion costs are applied

_____

[1]     Dongkuk claims that Petitioner is suggesting an adjustment to conversion costs would drop them from the calculations and thus ignore those costs' existence. *See* Defendant-Int.'s Br. at 6. This grossly misconstrues Plaintiff's argument. All parties agree that Dongkuk's towers must incur some amount of labor and overhead. The problem with Dongkuk's reporting is that labor and overhead assigned to each tower does not correspond with the physical characteristics of the towers.

"over monthly *production* quantities," not the weight of different tower types. *Id.* at 6. As discussed, the number of sections/towers produced each month may change irrespective of the types of towers being produced. For that matter, Defendant-Intervenor's attempts to tie conversion costs tower weight is an implicit recognition that Commerce failed to take weight into account in its own analysis.

**2.    Commerce Draws Unreasonable Conclusions from a Flawed Analysis to Justify Relying on Dongkuk's Unadjusted Conversion Costs**

Commerce also arbitrarily ignored important physical characteristics in its analysis of Dongkuk's conversion costs—specifically, type, weight, and height. These characteristics are placed at the beginning of the CONNUM, indicating that they are the most important physical characteristics in the CONNUM and should guide Commerce's difference-in-cost analysis. *See Dongkuk S&C Co. v. United States*, 134 F.4th 1320, 1329 (Fed. Cir. 2025); *see also* Defendant-Intervenor Br. at 7 (noting that height and weight are "the two most significant physical characteristics of a wind tower"). More than any other characteristics, type, weight, and height dictate the costs associated with production. Yet Commerce's analysis is based on the number of sections, the fourth-order CONNUM characteristic. *See* Defendant Br. at 22 (citing Final Decision Memorandum at 12).

Commerce justifies skipping over the first three physical characteristics because "{t}hose elements were accounted for in the adjustment of plate costs." *Id.* at 19 n.3. This statement only underscores Commerce's arbitrary approach to comparing Dongkuk's conversion costs to the physical characteristics of Dongkuk's merchandise. Commerce wrongly claims that "it was most appropriate to analyze the first three physical characteristics . . . in the context of direct material costs." *Id.* at 21. But this flatly contradicts Commerce's earlier observation that direct material

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

**Court No. 25-00104**                                                            NON-CONFIDENTIAL VERSION

costs are a different category of costs than conversion costs. *See id.* at 11. Indeed, as the WTTC explained in its opening brief, Commerce has not explained why adjusting plate costs (*i.e.*, direct material costs) also mitigates differences in separate cost categories (*i.e.*, direct labor, variable overhead, and fixed overhead costs). *See* Plaintiff Br. at 9-10.

In its response brief, Defendant does not attempt to resolve this contradiction; instead, it cites Commerce's decision to take the same incorrect approach in the previous proceeding. *See* Defendant Br. at 21 (citing Issues and Decision Memorandum for the Final Results of the 2021-2022 Administrative Review of the Antidumping Duty Order on Utility Scale Wind Towers from the Republic of Korea (Dep't Commerce Mar. 1, 2024), available at https://access.trade.gov/public/FRNoticesListLayout.aspx at barcode 4518796-02 (last visited on Apr. 3, 2026)). But the Court remanded the previous review for Commerce's failure to "address the first three enumerated CONNUM characteristics (tower sections, weight, and height) . . . ." *See Wind Tower Trade Coalition*, 810 F. Supp. 3d at 1358. Commerce repeated the same error in this review, and the Court should again remand for additional explanation.

Commerce's decision to exclude type, weight, and height from its analysis in favor of comparing costs only among tower models with the same number of sections is not harmless. A review of Commerce's own analysis spreadsheet confirms that towers with different numbers of sections have dramatically different weights/heights. For example, [      ] and [      ] both have [            ], while [      ] and [      ] both have [            ]. *See* Final DOC Analysis at Attachment 1. Yet [      ] is [                        ], while [      ] is [            ]. *Id.* The [                    ] themselves have [                        ]

8

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

**Court No. 25-00104**                                                    NON-CONFIDENTIAL VERSION

weights.[2] *Id.* at Attachment 1. Commerce's grouping strategy flattens these differences and obscures the cost variance between towers of different weights and heights. Further, as discussed in Plaintiff's opening brief, Commerce's analysis ignores [      ] entire CONNUMs, accounting for more than [          ] of total sections, simply because these CONNUMs are unique in their number of sections. Any "inherent limitations of the dataset" are due to Commerce's improper and narrow framing. *See* Defendant Br. at 23.

Defendant and Defendant-Intervenor fault Plaintiff for allegedly "fail{ing} to consider the different physical characteristics of finished wind towers." Defendant-Intervenor Br. at 7; *see also* Defendant Br. 24. Again, Defendant and Defendant-Interventor are mistaken. Plaintiff's analysis does not "compare{} conversions costs only to the number of sections" for each tower; that is what Commerce did. *See* Defendant-Intervenor Br. at 7. *But compare* WTTC Pre-Prelim Cmts. at Exhibit 1, *with* Final Decision Memorandum at 12 *and* Final DOC Analysis at Attachment 1. Rather, Petitioner used the per-section conversion costs for each CONNUM to make a fair comparison between CONNUMs with different production quantities. *See* WTTC Pre-Prelim Cmts. at Exhibit 1. That analysis permits a comparison of all CONNUM characteristics beginning with type, weight, and height and mirrors Commerce's approach in *Utility Scale Wind Towers from Indonesia.*

Moreover, contrary to Defendant-Intervenor's claim that Plaintiff "fails to consider the widely varying height or weight characteristics of each tower," Defendant-Interventor Br. at 7.

---

[2]    Notably, Dongkuk's [                          ] have per-section conversion costs that are [                                                    ]. Final DOC Analysis at Attachment 1. By restricting its comparison to only CONNUMs with the same number of sections, Commerce fails to account for unexplained differences and similarities between all CONNUMs. *Id.* Plaintiff's analysis permit this comparison. *See* WTTC Pre-Prelim Cmts. at Exhibit 1.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

**Court No. 25-00104**                                                      NON-CONFIDENTIAL VERSION

Plaintiff explicitly cited examples of CONNUMs where "there is no apparent relationship between tower height/weight and reported conversion costs." *See* Petitioner DOC Case Br., CD 63, PD 109, at 22 (Jan. 22, 2025) (citing WTTC Pre-Prelim Cmts. at Exhibit 1); *see also* Plaintiff's Br. at 7. The same cannot be said of Commerce's analysis, which fails to consider these physical characteristic categories. *See* Final Decision Memorandum at 12-13. Instead, contrary to Defendant-Intervenor's allegations that Plaintiff's analysis is "intentionally distortive" and "cherry-pick{ed}," Defendant-Intervenor Br. at 7, Petitioner has provided a broad-based analysis that considers all CONNUM characteristics and showcases multiple examples of unrelated costs and physical characteristics. *See* Plaintiff Br. at 8.

Finally, the record refutes Defendant-Intervenor's speculation that CONNUMs with lower production runs will have "[                                    ]" because they are "less efficient to produce." Defendant-Intervenor Br. at 7. As an initial matter, the volume of a production run is not a physical characteristic, so any variance due to production volumes and/or production efficiencies is unrelated to the physical characteristics of the merchandise. Moreover, while [      ] consists of [              ] and has the [      ] per-section conversion costs, it is closely followed by [

], which reflect production volumes of [          ] sections, respectively. *See* WTTC Pre-Prelim Cmts. at Exhibit 1. [      ] reflects the production of [                ] but has conversion costs that are [                ]. *Id.* This is simply another example of the unexplained variance in Dongkuk's conversion costs.

**B.    Commerce Erred by Using Unprofitable Financial Information from the Previous Review as the Basis for Constructed Value**

In its final results, Commerce based normal value on constructed value because Dongkuk had no above-cost sales. *See* Final Decision Memorandum at 3; *see also* 19 U.S.C. § 1677b(a)(4).

In such a situation, Commerce may use one of three "alternative methods" to derive selling, general, and administrative expenses and profits. *Id.* § 1677b(e)(2)(B); *see also* Final Decision Memorandum 3-4. While the first two alternatives are based "actual amounts incurred and realized" by companies under review with respect to home-market sales, the third of these alternatives—which Commerce used here—allows Commerce to use "any other reasonable method" to approximate expenses and profits for sales in the subject country of goods in the same general category as subject merchandise. *Id.* § 1677b(e)(2)(B)(i)-(iii). Commerce's goal when choosing between potential data sources under Alternative (iii) is to "find a good proxy (or surrogate) for the profits that the respondent can fairly be expected to build into a fair sales price of the particular merchandise." *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 542 (Fed. Cir. 2019) (*citing SKF USA Inc. v. United States*, 263 F.3d 1369, 1373 (Fed. Cir. 2001)).

As Commerce must find a proxy for profit, "{i}t is {Commerce's} practice not to rely on companies with zero-profit rates." *See* Issues and Decision Memorandum for the Less-Than-Fair-Value Investigation of Electrolytic Manganese Dioxide from Australia (Dep't of Commerce Aug. 14, 2008) at 6, available at https://access.trade.gov/Resources/frn/summary/australia/E8-18848-1.pdf (last visited Mar. 30, 2026) (*citing* Issues and Decision Memorandum for the Notice of Final Determination of Sales at Less Than Fair Value: Polyvinyl Alcohol from the Republic of Korea (Dep't of Commerce Aug. 11, 2003) at cmt. 1, available at https://access.trade.gov/Resources/frn/summary/korea-south/03-20320-1.pdf) (last visited Mar. 30, 2025). "Commerce has previously found that when a potential surrogate company is not profitable in the segment related to comparable merchandise, its financial statements should not be used to calculate CV profit and selling expenses of the respondent." Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less-Than-Fair-Value of Frozen

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

**Court No. 25-00104**                                                      NON-CONFIDENTIAL VERSION

Warmwater Shrimp from Indonesia (Dep't of Commerce Oct. 21, 2024) at cmt. 9, available at https://access.trade.gov/public/FRNoticesListLayout.aspx at barcode 4651805-02 (last visited Mar. 30, 2026). The same is true where a company was not profitable overall. Issues and Decision Memorandum for the Preliminary Determination in the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from Malaysia (Dep't of Commerce May 18, 2021) at 12, available at https://access.trade.gov/Resources/frn/summary/malaysia/2021-10918-1.pdf (last visited Mar. 30, 2026) ("*Wind Towers from Malaysia* PDM") (unchanged in final).

In the underlying review, Commerce was forced to rely on proxy profit information because Dongkuk had no home market sales at prices above cost. *See* Issues and Decision Memorandum for the Preliminary Results of the Administrative Review of the Antidumping Duty Order on Utility Scale Wind Towers from the Republic of Korea; 2022-2023 (Dep't of Commerce Sept. 6, 2024) at 10-11, available at https://access.trade.gov/public/FRNoticesListLayout.aspx at barcode 4627647-02 (last visited Apr. 3, 2026). Commerce relied on financial information derived from Dongkuk's reporting in the 2021-2022 administrative review. *See* Final Decision Memorandum at 10. However, during the 2021-2022 review period, Dongkuk was (1) unprofitable on a company-wide basis and [                                                          ]. *See* Dongkuk Section A Questionnaire Response, CD 5-8, PD 27-30 at Exhibit A-14 (Dec. 15, 2023) (*see* Income Statement); Dongkuk CV Cmts., CD 38-42, PD 62-66, at Exhibit CV-1, Attachment, p. 21 ("Dongkuk CV Cmts.") (Aug. 8, 2023); *see also* Plaintiff's Br. at 16-17. Despite conceding that Dongkuk was unprofitable and that it normally rejects unprofitable sources, *see* Final Decision Memorandum at 6, Commerce mined Dongkuk's 2021-2022 financial information for a [

                                                          ]. *See* Final DOC Analysis at 2, Attachment 1; *see also* Dongkuk CV Cmts. at Exhibit CV-1, Attachment, p. 21. Commerce based Dongkuk's

12

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

**Court No. 25-00104**                                    NON-CONFIDENTIAL VERSION

entire constructed profit experience for the 2022-2023 review on this [            ]. Final DOC

Analysis at 2.

In its brief, Defendant adopts Commerce's initial mischaracterization of prior decisions involving unprofitable financial information. Specifically, Defendant explains that "{i}n both *Wind Towers from Malaysia* and *Biodiesel from Indonesia*, Commerce rejected sources of SV {sic} profit when the company as a whole was profitable because segments of the company related to comparable merchandise were not profitable." Defendant Br. at 29. Defendant extrapolates from these decisions that Commerce may rely on "granular CV profit data" where a company generated a profit—"even though the company as a whole operated at a loss." *Id.* at 29-30.

However, Defendant is erroneously inverting Commerce's prior reasoning. For example, in *Wind Towers from Malaysia*, Commerce rejected two potential sources because "*either* the overall company was not profitable . . . *or* the segment related to comparable merchandise was not profitable." *Wind Towers from Malaysia* PDM at 12 (emphasis added). Likewise, in *Biodiesel from Indonesia*, Commerce explained that its practice is to reject financial statements that are unprofitable on a segment-specific basis "{i}n addition" to its practice of "exclud{ing} *companies with non-profitable net results* from the calculation of CV profit." Issues and Decision Memorandum for the Final Affirmative Determination in the Antidumping Duty Investigation of Biodiesel from Indonesia (Dep't of Commerce Feb. 20, 2018) at 35, available at https://access.trade.gov/Resources/frn/summary/indonesia/2018-04138-1.pdf (emphasis added) ("*Biodiesel from Indonesia* IDM"). In *Frozen Warmwater Shrimp from Indonesia*, Commerce found that "although the overall financial statements show profit, {the potential CV source's} seafoods product segment, which includes production of the merchandise identical to the

13

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

**Court No. 25-00104**                                    NON-CONFIDENTIAL VERSION

{merchandise under consideration}, incurred a loss in FY 2022." *See Frozen Warmwater Shrimp from Indonesia* IDM at 28. Commerce therefore rejected this source. *Id.* at 28-30.

These previous decisions highlight Commerce's established refusal to use information from a company that is unprofitable at the company-wide level or at unprofitable the segment-specific level despite overall profitability. They do not support Commerce's decision here to ignore both overall and [                    ] unprofitability to hunt for more "granular" profitability. *See* Defendant Br. at 29; *see also* Final Decision Memorandum at 7. Tellingly, Defendant does not identify a single instance where Commerce used the financial information of an unprofitable company over that of a profitable company, nor does Defendant cite examples where Commerce relied on select profitable sales despite overall and segment-specific lack of profitability. But that is what Commerce did here, bypassing numerous other profitable sources of proxy information. *See* Plaintiff's Br. at 15-16.

For its part, Defendant-Intervenor dismisses Dongkuk's lack of profitability because "a significant portion of its income and expenses relate to sales to Japan, China, the United States, and other markets, as well as from the sale of construction services." *See* Defendant-Intervenor Br. at 11 (citing Dongkuk Section A Questionnaire Response at Exhibit A-15). Dongkuk did not explain why these factors are relevant, and provided no example of Commerce considering these or similar factors when analyzing overall profitability for purposes of selecting a profit ratio to be used in determining constructed value. And to the extent that Dongkuk's point is simply that its (unprofitable) business as a whole is generally unrelated to home market sales of wind towers, Plaintiff has already demonstrated that Dongkuk was [                    ] on its sales of wind

14

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

**Court No. 25-00104**                                                    NON-CONFIDENTIAL VERSION

towers to the home market. *See* Plaintiff Br. at 17 (calculating overall [      ] on Dongkuk's [     ] home market sales in the 2021-2022 period of review).[3]

Defendant has also conflated Commerce's practice of excluding unprofitable companies from consideration as sources of CV profit data with its criteria for selecting among qualified sources. *See* Defendant Br. at 30 ("Commerce additionally explains that none of the other CV profit data sources on the record were more appropriate than Dongkuk's data."). As Defendant notes, Commerce's practice for selecting among profit proxies involves four criteria: "(1) the similarity of the potential surrogate companies' business operations and products to the respondents'; (2) the extent to which the financial data of the surrogate company reflect sales in the home market and do not reflect sales in the United States; (3) the contemporaneity of the data; and (4) the extent to which the customer base of the surrogate company and the respondent are similar." *Id.* at 27-28 (citing Final Decision Memorandum at 5). Notably, profitability is not among these four criteria. That is because Commerce's practice is to disqualify unprofitable companies as a threshold matter. *See, e.g.*, *Biodiesel from Indonesia* IDM at 27-28 (disqualifying the sole unprofitable company before weighing the merits of the remaining potential sources); *See* Issues and Decision Memorandum in the Less-Than-Fair Value Investigation of Common Alloy Aluminum Sheet from the Sultanate of Oman (Dep't of Commerce Mar. 1, 2021) at 26, available at https://access.trade.gov/Resources/frn/summary/oman/2021-04741-1.pdf (last visited Apr. 3, 2026) (finding that contemporaneous financial information from an in-country producer of

---

[3]    In fact, Dongkuk has had only [                          ] among the [               ] sold in the 2021-2022 and 2022-2023 reviews. *See* Prelim. Calc. Memorandum (Sept. 6, 2024) CD 50-55, PD 91, at Attachment 1, p. 19; Dongkuk CV Cmts. at Exhibit CV-1, Attachment 1, p. 20-21.

comparable merchandise was "unusable" because it was "not profitable"); Issues and Decision Memorandum for the Final Results of the 2018-2019 Administrative Review of the Antidumping Duty Order on Certain Steel Nails from the Sultanate of Oman (Dep't of Commerce Feb. 24, 2021) at 14, available at https://access.trade.gov/Resources/frn/summary/oman/2021-05304-1.pdf (last visited Mar. 30, 2026) (clarifying that financial information from an unprofitable company "should not be included as a viable candidate for the CV calculation."). In these previous cases, Commerce did not weigh profitability against contemporaneity or any other of the four factors; it dismissed the unprofitable companies' financial information outright.

Commerce departed from its standard practice of disqualifying unprofitable financial information from consideration as a proxy for profit. Commerce must re-evaluate its selection of the basis for CV profit and selling expense information according to this established practice.

## III. <u>CONCLUSION</u>

For the reasons detailed above and in our opening brief, we respectfully submit that this Court should remand the Department's Final Results in the 2022-2023 administrative review of utility scale wind towers from the Republic of Korea for further consideration consistent with the arguments made in our briefing.

**Court No. 25-00104**                                    NON-CONFIDENTIAL VERSION

<div style="margin-left:50%">

Respectfully submitted,

*/s/ Robert E. DeFrancesco, III*
Robert E. DeFrancesco, III, Esq.
Maureen E. Thorson, Esq.
Laura El-Sabaawi, Esq.
John Allen Riggins, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Wind Tower Trade Coalition*

</div>

Dated: April 6, 2026

<div align="center">17</div>

**Court No. 25-00104**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the Scheduling Order (September 16, 2025), ECF No. 21, the undersigned certifies that this brief complies with the word limitation requirement.  The word count for The Wind Tower Trade Coalition's Reply Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 4,505 words.

<u>*/s/ Robert E. DeFrancesco, III*</u>
(Signature of Attorney)

<u>Robert E. DeFrancesco, III</u>
(Name of Attorney)

<u>Wind Tower Trade Coalition</u>
(Representative Of)

<u>April 6, 2026</u>
(Date)